GREENBERG TRAURIG, LLP
Rick L. Shackelford (SBN 151262)
Adam Siegler (SBN 116233)
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone: 310-586-7700; Fax: 310-586-7800
Email:  *ShackelfordR@gtlaw.com*
          *SieglerA@gtlaw.com*

Attorneys for Defendants
Ocean Spray Cranberries, Inc. and Arnold Worldwide, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL HILSLEY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OCEAN SPRAY CRANBERRIES, INC.; ARNOLD WORLDWIDE LLC, and Doe Defendants 1 through 5, inclusive,<br><br>Defendant. | CASE NO.: 3:17-CV-2335-GPC-MDD<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF CRYSTAL HILSLEY'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:          October 12, 2018<br>Time:         1:30 p.m.<br>Courtroom:   2D<br><br>Date of Removal:      September 19, 2017 |

## Table of Contents

                                                                                    **PAGE**

I.      INTRODUCTION ......................................................................................... 1

II.     HILSLEY'S ATTEMPT TO SATISFY RULE 23(a) DOES NOT
        WITHSTAND RIGOROUS ANALYSIS ..................................................... 2

        A.    There Is No Commonality Because Malic And Fumaric Acid
              Are Not Flavors ............................................................................. 2

        B.    Hilsley is not typical of the putative class.......................................... 4

        C.    Neither Hilsley nor her counsel are adequate to represent any
              class. ............................................................................................. 6

              1.    Hilsley Was Recruited By Counsel For This Case. ............... 6

              2.    Hilsley Refused to Answer Interrogatories............................ 7

              3.    Hilsley Refused to Produce Documents. .............................. 8

              4.    Hilsley Refused to Appear For Deposition............................ 9

              5.    Hilsley Gave Knowingly False Testimony In Deposition. .......... 9

              6.    Hilsley's Self-Styled Expertise Disguises A Lack of
                    Knowledge. ...................................................................... 11

              7.    Hilsley Is Inconsistent On Whether She Would Purchase
                    Again. .............................................................................. 12

        D.    Hilsley's Showing on Adequacy Cannot Overcome Her
              Shortcomings.............................................................................. 13

        E.    Class Counsel Are Not Adequate................................................. 14

III.    HILSLEY'S SHOWINGS UNDER RULE 23(b) DO NOT
        WITHSTAND RIGOROUS ANALYSIS ................................................... 16

        A.    Common Issues Do Not Predominate. ......................................... 16

        B.    Plaintiff's Damages Theory Does Not Satisfy Comcast................. 17

              1.    Plaintiff's purported consumer survey asked the wrong
                    questions.......................................................................... 17

              2.    Dr. Goedde's price premium model is fatally flawed........... 22

        C.    Injunctive Relief Is Not Warranted Here Because Hilsley
              Would Not Buy The Products Again. ........................................... 24

IV.     CONCLUSION........................................................................................ 25

i

# <u>Table of Authorities</u>

**Page(s)**

**Federal Cases**

*Abdullah v. U.S. Sec. Assocs.*,
   731 F.3d 952 (9th Cir. 2013) ...................................................................2

*Bartley v. Japan Processing Serv. Co.*,
   No. 11-cv-2759-BAS(JLB), 2016 U.S. Dist. LEXIS 78131
   (S.D. Cal. June 15, 2016)......................................................................14

*Brazil v. Dole Packaged Foods, LLC*,
   No. 12-cv-01831-LHK, 2014 U.S. Dist. LEXIS 157575
   (N.D. Cal Nov. 6, 2014)........................................................................24

*CE Design Ltd. v. King Architectural Metals, Inc.*,
   637 F.3d 721 (7th Cir. 2011) ...................................................................9

*Chen-Oster v. Goldman, Sachs & Co.*,
   114 F. Supp. 3d 110 (S.D.N.Y 2015) ...................................................18

*Comcast Corp. v. Behrend*,
   569 U.S. 27, 133 S. Ct. 1426 (2013)............................................1, 3, 17

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ......................................................2

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579, 113 S. Ct. 2786 (1993)..............................................18, 19

*Davidson v. Kimberly-Clark Corp.*,
   889 F.3d 956 (9th Cir. 2018) .............................................................24, 25

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
   300 F. Supp. 3d 1073 (S.D. Cal. 2017)..................................................14

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ........................................................3, 6, 18, 19

*Ferdik v. Bonzelet*,
   963 F.2d 1258 (9th Cir. 1992) ...............................................................14

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
   301 F.R.D. 116 (S.D.N.Y. 2014)......................................................18, 19

ii

*Freeman v. Time, Inc.*,
    68 F.3d 285 (9th Cir. 1995) ........................................................................22

*G.E. v. Joiner*,
    522 U.S. 136, 118 S. Ct. 512 (1997).............................................................19

*General Tel. Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982)........................................................................................3

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) .........................................................................6

*Kay v. Wells Fargo & Co.*,
    247 F.R.D. 572 (N.D. Cal. 2007)..................................................................16

*Lerwill v. Inflight Motion Pictures, Inc.*,
    582 F.2d 507 (9th Cir. 1987) .........................................................................6

*Ogden v. AmeriCredit Corp.*,
    225 F.R.D. 529 (N.D. Tex. 2005)......................................................11, 12, 15

*Sheinberg v. Sorensen*,
    606 F.3d 130 (3d Cir. 2010) ........................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338, 131 S. Ct. 2541 (2011)............................................................3

*Weiner v. Snapple, Inc.*,
    No. 07-cv-8742-DLC, 2010 U.S. Dist. LEXIS 79647
    (S.D.N.Y. Aug. 5, 2010) .......................................................................22, 23

**California Cases**

*Brockey v. Moore*,
    107 Cal. App. 4th 86 (2003) ........................................................................22

*Kwikset Corp. v. Superior Court*,
    51 Cal. 4th 310 (2011) .................................................................................22

**Federal Statutes**

21 C.F.R. § 101.30
    (b)(1) ............................................................................................................20
    (f)..................................................................................................................20

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Fed. R. Civ. P. 7.1 ....................................................................................11

Fed. R. Civ. P. 23 ................................................................................2, 14
    (a) .............................................................................................2, 3, 16
    (b) ...............................................................................................2, 16
    (b)(2) ..............................................................................13, 24, 25
    (b)(3) ..................................................................................................16
    (g)(1)(A)(i)-(iv) ...............................................................................15

Fed. R. Evid. 702 ...................................................................................18

## I.     **INTRODUCTION**

Plaintiff Hilsley's motion for class certification should be denied, because she has failed to make the required evidentiary showings.  Her claim depends entirely upon demonstrating that the ingredients malic and fumaric acid function *as flavors* in the Ocean Spray products she purchased.  It is not enough to claim that those ingredients are "artificial," because Ocean Spray never claimed that the products at issue were "all natural" or had no artificial ingredients.  If those ingredients do not function as flavors, then Hilsley's claims, as well as those of any putative class, cannot succeed.  Accordingly, one would expect her class motion to be supported by significant and probative evidence regarding the function of those ingredients *as flavors* in each of the products at issue, including evidence from knowledgeable persons like product developers, ingredient technicians and food scientists, as well as analytical tests of those same products.  She has provided none, relying solely upon her unverified Complaint.

Moreover, the damages models proposed by Hilsely's experts, Belch and Goeddes, do not satisfy *Comcast*.  Dr. Belch's survey, in part, tested consumer response to a completely different "juice" product that contained no juice and only artificial flavoring – a product Ocean Spray does not make.  Dr. Goeddes, who has no valid credentials in this field, came up with a "price premium" model that conflated premium chilled juices, shelf stable juices, juice cocktails, and virtually any kind of liquid beverage sold in grocery stores, to generate a completely contrived "premium" which Hilsley allegedly paid (even though she didn't care about price when she bought).

Even if a class could be based on the unsupported flavor claim, Hilsley is the wrong lead plaintiff.  She is highly idiosyncratic, refused to answer interrogatories, refused to produce documents, initially refused to appear for deposition, and then, when she finally was deposed (after the class discovery cutoff date) gave false testimony.  She is not an adequate representative.  Likewise, Hilsley's proposed class counsel are not adequate because they facilitated her obstruction of discovery and permitted false testimony at deposition.  Her motion for class certification should be denied.

## II.   HILSLEY'S ATTEMPT TO SATISFY RULE 23(A) DOES NOT WITHSTAND RIGOROUS ANALYSIS

A party seeking class certification under Rule 23 "must affirmatively demonstrate his compliance with the Rule," and "bears the burden of showing that *each* of the four requirements of Rule 23(a) and *at least one* requirement of Rule 23(b) have been met." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 937 (C.D. Cal. 2015).

As to Rule 23(a), "the party seeking class certification must show that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 956 n.4 (9th Cir. 2013).  Hilsley's evidence cannot show commonality or typicality, and she is not an appropriate class representative.[1]

### A.   There Is No Commonality Because Malic And Fumaric Acid Are Not Flavors

Commonality is an essential requirement of Rule 23(a).  Hilsley's motion describes the common issue as follows: "The gravamen of the Class' claims is that Ocean Spray did not provide products that conformed to these labels because those products in fact contain artificial <u>flavoring</u> ingredients."  [Br. at 7:24-26.]  To establish commonality, Hisley must present evidence that the challenged ingredients, malic acid and/or fumaric acid are (i) present in the products; and (ii) function as flavors in them.  Prior to the class discovery cutoff date, Hilsley produced *no evidence* that these ingredients function as flavors.  Her class motion is supported by *no evidence* that the ingredients function as flavors.  Her motion could, and should, be denied on that ground alone without ever reaching the remaining deficiencies.

Her sole "support" for asserting malic acid and fumaric acid function as flavors is her unverified Complaint, and an unpublished 2008 opinion, cited for the proposition that

---

[1] Ocean Spray and Worldwide do not contest numerosity.

"In ruling on a motion for class certification, 'the court is bound to take the substantive allegations of the complaint as true.'"  [Br. at 5:24-26, *quoting Wiegle v. Fed Ex Ground Package Sys.,* 2008 U.S. Dist. LEXIS 10246, at *8 (S.D. Cal. Feb. 12, 2008).]

Hilsley's position is completely without merit.  As the Supreme Court stated in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541 (2011):

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.  We recognized in *Falcon* that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," 457 U.S. at 160, 102 S. Ct. 2364, and that certification is proper only if "the trial court is satisfied, after a rigorous analysis that the prerequisites of Rule 23(a) have been satisfied," *id*. at 161, 102 S. Ct. 2364, see *id*. at 160, 102 S. Ct. 2364 ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable.")  Frequently, that "rigorous analysis" will entail some overlap with the merits of the plaintiff' underlying claim.  That cannot be helped.

*Dukes*, 564 U.S. at 349-51.

To the extent any doubt remained, it was dispelled in *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 133 S. Ct. 1426, 1432 (2013), in which the Court stated that each and every aspect of Rule 23(a) must be established through "evidentiary proof," which may require probing beyond the pleadings.  This "evidentiary proof" must be subjected to, and withstand, a court's rigorous analysis for certification to be granted.  *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161 (1982) (court must apply rigorous analysis to ensure all requirements of Rule 23(a) are satisfied).  *See also Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 981 (9th Cir. 2011) (court must consider merits issues to the extent they overlap with class certification requirements).

Hilsley's "evidentiary proof" falls far short of the mark.  To give just a few examples, Hilsley's declaration states that she purchased four (and only four) of the products identified in her Complaint: (i) Ocean Spray Cran-Apple; (ii) Ocean Spray

Cran-Grape; (iii) Ocean Spray 100% Apple juice; and (iv) Ocean Spray Cranberry Juice Cocktail. [See Hilsley Declaration, ¶4.] Her counsel, Ronald Marron, attached to his declaration copies of labels corresponding to these four products. [Exhibit 3, page 19, 20.] The label for 100% Apple Juice clearly shows the ingredients as "Apple juice (filtered water, Apple Juice from Concentrate)." Similarly, the label for Cranberry Juice Cocktail shows the ingredients as: "Filtered water, Cranberry juice (Water; Cranberry Juice Concentrate), Sugar, Ascorbic acid (Vitamin C), Vegetable Concentrate for Color." *There is no malic acid or fumaric acid in either product.* Obviously, then, the issue of *whether the challenged ingredients are even present* is not "common" to all of the products for which Hislely seeks to certify a class. Thus, the precious little evidence she presented conclusively proves that her motion cannot be granted, because the "common" issue is not "common" to all of the products in her would-be class.

Without *evidence* that the challenged ingredients function as flavors, Hilsley's claims cannot prevail, because that is an essential element of each of her claims for relief. Accordingly, Ocean Spray is filing a motion for summary judgment along with this class certification opposition. In that motion, Ocean Spray will describe the regulatory overlay as it applies to dual purpose ingredients like malic and fumaric acid. That motion will also set forth undisputed evidence that these ingredients did not function as ingredients in any of the Ocean Spray products at issue, but rather served as non-flavored acidulants that control the acidity of the respective products.

### B.   Hilsley is Not Typical of The Putative Class.

Hilsley is so idiosyncratic that she cannot be said to be "typical" of anyone, much less an entire class of purchasers she seeks to represent. After more than 20 years of basically administrative positions after college, Hilsley enrolled in an on-line school in order to become a "health coach." [Shackelford Decl., Ex. 1 (Hilsley depo.), at 12:10-13:25.] She acknowledges that there are no certification or testing requirements to be a "health coach;" nonetheless, she describes this work as her "true passion." [*Id.*, at 167:14-168:6.] In furtherance of her passion, Hilsley has tried to build a business in

providing label reading advice.  Indeed, she holds herself out on-line as a self-described "label guru" (another unregulated description that requires no certification or specialized training).  [*Id.*, at 128:23-129:8.]  She has tried to build a business by offering, for a fee, to accompany shoppers to the grocery store, sharing whatever assistance the information she purchased through her on-line education might offer.  [*Id.*, at 166:23-167:4.]  As of the date of her deposition, no one had actually hired her as yet, but she continues to advertise her services through social media, as well as talks she gives through civic organizations.[2]  [*Id.*, at 132:2-12.]

---

[2]      If her deposition testimony in this case is any indication, anyone who paid for her expertise as a "label guru" would not get good value for the money.  She gave the following testimony:

Q:      With respect to your purchases of Ocean Spray CranApple, did you understand no artificial flavors to mean all natural?

A:      I would hope that it would.

Q:      Aside from hope, I'm asking – trying to get your understanding.

A:      Yes, I would hope that all natural would mean there's no artificial flavoring in there.  That's what natural is.  Natural doesn't have anything artificial in it.

[Hilsley depo., at 81:25-82:9.]  However, she also testified that during the entire time she bought Ocean Spray products, she never read the actual ingredient statement.  [*Id.*, at 94:6-9.]  And Ocean Spray never made an "all natural" claim on these products.  [Fritz Decl., ¶ 19.]

There were other examples of her shortcomings as a label guru.  In her complaint, she alleged that the Ocean Spray labels suggest to a reasonable consumer that the product is "made exclusively from and is flavored only with natural fruit juices.  [Complaint, ¶21.]  Yet, when shown the label of the product she had actually bought, she recognized that the label clearly states that the product contained 15% fruit juice.  Nonetheless, she gave the following testimony:

Q:      Now as you read the label you were able to see that the product label says it contains 15 percent juice, correct?

A:      Correct.

Q:      Is there something on this label that suggests to you that this 15 percent juice product is made exclusively from natural fruit juices?

A:      Yes, because it says that it's no artificial flavors or preservatives regardless of the percentages of juices in a product, you would still assume it's from a natural source.

[Hilsley depo., at 85:2-12.]  She offered additional, equally nonsensical answers on this point, but was never willing to acknowledge the obvious incongruity between her allegation about the product being made "exclusively" from fruit juice and the label stating that it contained 15% juice.  Eventually, she declared a break and left the deposition room.  [*Id.*, at 87:25-88:25.]

5

Hilsley's guru-for-hire services are only one prong of her efforts to monetize her on-line education.  She has sought out opportunities to act as a social media "influencer" for a number of food products, and has also worked through acquaintances to pursue other influencer possibilities.  [Hilsley depo., at 151:5-155:6.]  She frequently posts on social media regarding food-related topics, including publicizing her belief that humans should not consume dairy products, such as cheese, that are made from the milk of other species.  [*Id.*, at 168:1-4.]  Thus, unlike absentee class members, the mere fact that Hilsley has put her name forward as a would-be class representative is doubtless being done, at least in part, in hopes of adding credibility to her guru-dom.  This creates a financial incentive on her part that is not typical of other class members, and which creates bias and credibility issues that could harm the interests of absentee class members.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (affirming denial of class certification in part due to plaintiff's atypicality).  As the Ninth Circuit has observed, typicality is not satisfied when the lead plaintiff will be preoccupied with defenses unique to her, as Hilslely most certainly would be in this case.  *Id*.  *See also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (typicality not satisfied when plaintiff's unique background and factual circumstances present defenses not applicable to other members of proposed class).

## C.   Neither Hilsley Nor Her Counsel are Adequate to Represent Any Class.

Hilsley's atypicality also prevents her from meeting the requirements to be an adequate class representative, which consist of a two-pronged inquiry of whether the named plaintiff is able to prosecute action vigorously through counsel, and whether she has conflicting interests with other class members.  *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1987).  Her conduct throughout this litigation has been anything but vigorous, and has disqualified Hilsley as a class representative.  Consider:

### 1.   Hilsley Was Recruited By Counsel For This Case.

Even though she was a labeling guru, Hilsley had no problem with Ocean Spray's products and did not come up with the idea to bring this lawsuit on her own.  Instead, she

was recruited by counsel, Mr. Elliot, in some sort of online "Meet-Up" group. [Hilsley depo., at 71:6-23.] She had no prior legal relationship with the lawyer doing the soliciting, did not interview any other potential law firms to represent her, and did only minimal online research into Mr. Elliot. [*Id*., at 73:6-73:14.] Before her recruitment, it had never occurred to Hilsley that she had been "harmed" by purchasing Ocean Spray products. So, for example, she never contacted Ocean Spray to complain about a product she had purchased. [*Id*., at 92:4-93:2.]

### 2.   Hilsley Refused to Answer Interrogatories.

Once in the case, Hilsely refused to participate meaningfully in conducting discovery. Well in advance of the Court-ordered class discovery cutoff date of July 9, 2018, Ocean Spray propounded a set of 24 interrogatories which were carefully tailored to the specific averments in the Complaint. In response to all 24 interrogatories Plaintiff provided no substantive information whatsoever, and gave the same non-response:

> Discovery is ongoing and Plaintiff reserves the right to supplement this response as discovery proceeds.

[Shackelford Decl., Ex. 7.]

On July 19, 2018, counsel participated in a telephonic conference, in which Ocean Spray's counsel specifically asked if Hilsley would provide substantive responses to <u>any</u> of the 24 interrogatories, and Hilsley's counsel said: "No." [Shackelford Decl., ¶9.] Later, when she sat for deposition (well after the class discovery cutoff date), Hilsley was asked how much time she had spent trying to provide responses to Ocean Spray's interrogatories. She claimed she had spent 5 to 7 hours going over the questions and providing information to her attorneys, making the failure to provide a single substantive response to Ocean Spray all the more egregious. Ocean Spray's attempt to probe for that information produced this exchange:

> Q:   I'm trying to understand how, out of the five to seven hours that you invested in providing information to your lawyers, they haven't provided anything to me.

Mr. Elliot:    Objection as to the form of the question.  Objection, argumentative.
Objection, calls for speculation.  Objection, beyond the capacity of this
witness.  You can answer the question, if you'd like.

A:    And I would say that that's between my attorney and you as to how he
answered the questions because he's given them to you.  He's given you the
answers.  ***They're not going to change.***

[Hilsley depo., at 65:12-24 (emphasis added).]

Q:    I'm trying to find out how it is I get from the information you've provided to
respond to these questions, how do I get that into my hands?

Mr. Elliot:    Objection as to form of the question.  I'm going to direct the deponent
not to answer that question.

Q:    On what ground?

Mr. Elliot:    On ground that it's protected by the attorney/client privilege and
attorney work product.

Q:    Let me ask you this question.  Are any of the responses in Exhibit 8
[Hilsley's responses to Ocean Spray's interrogatories] going to change?

A:    No.

[*Id*., at 67:4-17.]

Thus, Hilslely claimed she spent 5 to 7 hours discussing the interrogatories with
her counsel, only to provide zero substantive information.  And even though her
interrogatory responses "reserved the right to supplement" at some undetermined time in
the future, ***she has testified emphatically that these non-responses will never change***.

### 3.    Hilsley Refused to Produce Documents.

Ocean Spray also served 58 requests for production well before the class discovery
cutoff date, which were likewise keyed to specific claims in the Complaint.  In response,
Hilsley served the same boilerplate objections and produced ***not a single page*** of
documents.  [Shackelford Decl., ¶5.]

Ocean Spray's notice of deposition also requested that Hilsley produce all of her

8

blog or online posts related to "food nutrition," "food labels," and the Ocean Spray products at issue. [Shackelford Decl., ¶14.] Thus, Hilsley had a second chance, and a second obligation, to produce documents. She produced nothing from her own records – not a single label, email or blog post. Her response did provide one additional nugget that, in the context of her prior discovery responses, which consisted of producing no documents or substantive responses, is laughable: "Plaintiff objects to this request on the ground that it is cumulative of Defendant's Requests for Production of Documents (Set One), which were served on June 1, 2018." To be fair, her two law firms did produce a single document – a one-page document showing results of a test that they had ordered, which had nothing to do with her. [*Id*.] Thus, Hilsley's entire document production for this case consists of one (1) page.

### 4. Hilsley Refused to Appear For Deposition.

Hilsey refused to appear for deposition prior to the July 9, 2018 discovery cut-off set forth in this Court's Scheduling Order. (Dkt.# 14.) For more than a month prior to the class discovery cutoff date, Ocean Spray's counsel repeatedly requested dates for her deposition, but Hilsley never provided a date prior. In frustration at this stonewalling, Ocean Spray finally served a notice of deposition for Hilsley to take place on the discovery cutoff date, only to be chided by Hilsey's counsel for "unilaterally" selecting a date. Counsel also informed Ocean Spray that Hilsley would not be produced on the date noticed for her deposition. [Shackelford Decl., ¶¶10-11.] The two separate law firms representing her both said they were unavailable on that day. Instead, Hilsley demanded that her deposition be taken on a Saturday, which Ocean Spray accommodated, on August 4 – nearly a month after the class discovery cutoff.

### 5. Hilsley Gave Knowingly False Testimony In Deposition.

If Hilsley's lack of diligence in responding to discovery left any doubt as to her inadequacy as a class representative, her willingness to give patently and easily demonstrably false deposition testimony should disqualify her. *See, e.g. CE Design Ltd. v. King Architectural Metals, Inc*., 637 F.3d 721 (7th Cir. 2011) (reversing order

certifying class and remanding for further consideration of whether inconsistencies in class representative's deposition testimony might be detrimental to class's claims).

Hilsley testified that she had ***personally researched*** the Complaint filed on her behalf and had even done research into some of the allegations. [Hilsley depo., at 70:6-19.] Thus, she was asked at her deposition specifically about paragraph 68 of the Complaint, which contained allegations about statements allegedly made by an executive of Ocean Spray to investors:

> John Compton, the Chief Executive Officer of Ocean Spray's parent company, stated to investors at the Morgan Stanley Consumer & Retail Conference, "We have talked extensively to consumers about this idea, and they come back and tell us the number one motivation for purchase is products that claim to be all natural."[3]

But Ocean Spray has no parent company. [Shackelford Decl., Ex., 16; Fritz Decl., ¶15.] Instead, the allegations in this paragraph pertain to statements made by a PepsiCo executive, which were made in one of the **other** malic acid cases filed by her attorneys on behalf of a **different** named plaintiff. Ocean Spray also is not owned by PepsiCo, or any of its various business units. There could have been no surprise to Hilsley or her counsel that this topic might come up at her deposition. The subject of "John Compton" was raised in the notice of deposition. Those allegations were also the subject of Ocean Spray's interrogatory 12, to which Hilsley responded "Discovery is ongoing and Plaintiff reserves the right to supplement this response as discovery proceeds."

Rather than acknowledge a mistake, however, Hilsley dug the hole for her falsehood ever deeper, testifying that she had independently researched and confirmed the issue and had even seen the statement herself.[4] All of this was utterly false and that

---

[3] This same averment was made against Frito-Lay in ¶57 of the Complaint in *Allred v. Frito-Lay North Am. Inc.*, Case No. 3:17-cv-012345-BGS. The only difference was the substitution of PepsiCo in place of Ocean Spray.

[4] Hilsley testified as follows:

> Q:   Apart from anything your lawyers have told you, do you have any information to substantiate the statements made in paragraph 68 of the

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

could have been confirmed by any rudimentary research. Worse yet, she had two lawyers in the room defending the deposition, who both knew or should have known the testimony was false, because (i) they had filed the complaint against Frito-Lay; and (ii) they had Ocean Spray's Rule 7.1 Corporate Disclosure Statement expressly stating that Ocean Spray has no parent company. [Shackelford Decl., Ex. 16.] Neither of them made any attempt to set the record straight or pre-empt Hilsley's false embellishments.

### 6.    Hilsley's Self-Styled Expertise Disguises A Lack of Knowledge.

In her deposition, Hilsley claimed to have unique insight into artificial flavors by virtue of her study of what she called peer-reviewed scientific papers. When asked to produce them in discovery, she failed to produce a single such paper.[5] Likewise, she was unable at her deposition to name a single paper, abstract, author, title or anything else. [Hilsley depo., at 144:1-8.]

The court's opinion in *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529 (N.D. Tex. 2005) is instructive here. In particular, the court noted how little the class representative knew versus how much information she relied upon counsel to provide. In denying class

---

|     |                                                                                           |
| --- | ----------------------------------------------------------------------------------------- |
|     | complaint?                                                                                 |
| A:  | It's information that's readily available to the public because it's been stated to investors. So anybody could easily find them. |
| Q:  | Did you easily find them?                                                                  |
| A:  | Absolutely.                                                                                |
| Q:  | Okay. Then who is John Compton.                                                            |
| A:  | He's a CEO of Ocean Spray's parent company.                                                |
| Q:  | What is Ocean Spray's parent company?                                                      |
| A:  | I don't know.                                                                              |
| Q:  | Did you yourself do any research to find out who John Compton was?                         |
| A:  | No. He made a statement to the company. I didn't need to.                                  |
| Q:  | Did you read the statement?                                                                |
| A:  | Yes.                                                                                       |

[Hilsey depo., at 114:7-24.]

[5] Her notice of deposition asked her to produce "All documents that reflect research, including online searches, by or on behalf of Plaintiff with respect to malic acid or fumaric acid." Again, her response consisted of objections that this request was cumulative, and her parroted "Discovery is ongoing and Plaintiff reserves the right to supplement this response as discovery proceeds." In light of her sworn testimony that she had in fact conducted such research, the refusal to produce anything is a testament to the obstructionist tactics of Hilsley's counsel in this case.

11

certification solely based upon the inadequacy of the class representative, the court noted:

> Furthermore, it is apparent that much of her knowledge is derived from counsel. While this is acceptable to some degree, the extent to which it is present in this case renders Ogden's adequacy arguments unpersuasive. . . . it is apparent that counsel has provided the vast majority of the knowledge that she does possess. Ogden has testified that she has relied on her counsel to make many of the decisions involved in pursuing her claims, yet she has done little to no research regarding the suitability of her attorneys' acting as class counsel. Ogden initiated her relationship with her attorneys in response to a solicitation by them, has not contacted or spoken with any other attorneys regarding her claims, does not have any independent knowledge of her attorneys' experience, has failed to seek any references, and has not given her counsel any instructions as to their representation. These facts tend to weigh against a finding of adequacy."

*Id*. at 535 (internal citations omitted). In light of these shortcomings, the court found that the would-be class plaintiff had failed to carry her burden of proof as to her adequacy, observing:

> Precedent and due process concerns require that courts protect potential class members by ensuring that the named plaintiffs demonstrate their adequacy. Class action lawsuits are intended to serve as a vehicle for capable, committed advocates to pursue the goals of the class members through counsel, not for capable, committed counsel to pursue their own goals through those class members.

*Id*. at 537-38, *quoting Berger v. Compaq Computer Corp*., 257 F.3d 475, 484 (5th Cir. 2001). Hilsley shares these shortcomings and more, and is equally inadequate.

### 7. Hilsley Is Inconsistent On Whether She Would Purchase Again.

Hilsley can't even make up her mind if she would buy the products if they were "correctly" labeled. Her declaration in support of class certification states: "I ***would, and intend to, purchase*** the Ocean Spray Products again in the future if the labels were accurate and the Products actually contained 'No artificial flavors or preservatives.'" [Hilsley Dec., ¶8.] But she testified at deposition that she ***would not buy any products*** that contained "artificial" malic or fumaric acid: "The answer is no, as long as they contain anything that's artificial, I wouldn't purchase it." [Hilsley depo. 119:18-20.] In

other words, she would not purchase the products again unless they were reformulated to remove any artificial ingredients, no matter their function. Which, of course, does not explain her decision to stop buying Ocean Spray's 100% Apple Juice and Cranberry Juice Cocktail, which do not contain artificial ingredients.

Reconciling her positions is impossible. As noted below, Hilsley's deposition testimony would have made any attempt to certify an injunctive relief class under Rule 23(b)(2) impossible, because she would never buy the actual products at issue again; she would only consider buying products reformulated to suit her preferences. Accordingly, in order to try and salvage a possible 23(b)(2) class, she signed off on a highly nuanced, lawyer-crafted declaration at odds with her prior sworn testimony. Her inconsistent positions demonstrate that she is not an adequate representative.

### D.   Hilsley's Showing on Adequacy Cannot Overcome Her Shortcomings.

Hilsley's class certification motion devotes one conclusory paragraph to her alleged "adequacy" as a class plaintiff, supported by two paragraphs in her check-the-box declaration. Her showing is much more noteworthy for what she leaves out. She fails to mention that she has devoted, by her own sworn deposition testimony, only about an hour total to attempting to respond to document requests in this case. [Hillsey depo., at 42:22-43:21.] She took no steps to preserve or recover data from a computer that, in her words, "died" after this suit was filed. [*Id*., at 171:2-13.] As to whether she made any effort to search her new computer or any back up storage, her counsel interjected a privilege objection, so at this point, all we know is that she has not produced a single document from her own records. [*Id*., at 172:24-174:5.] She fails to mention any effort she made to conduct searches for responsive documents. She nevertheless acknowledges that she has numerous blog posts that are responsive to discovery requests, but failed to produce any of them. Any "burden" of providing information on her crystalclearkids.com website, along with a verification that she had produced everything responsive, would have been minimal.

At this point, we do not know whether Hilsley bears the lion's share of

responsibility for the failure to take her discovery obligations seriously or whether that blame goes to one or the other of the two law firms attempting to represent her and the putative class. All we know is that none of them did any heavy lifting to move this case forward prior to the class discovery cutoff date. Instead, they collectively treated the court-ordered cutoff date as a mere suggestion to be ignored if it inconvenienced them, and, apparently, intended to "supplement" the non-responses if and when the mood ever struck them. The stonewalling continued even beyond the class discovery cutoff date, as Hilsley and her counsel refused to produce the experts she put forward in support of her motion to be deposed on their class declarations. [Shackelford Decl., ¶16.]

Even if Hilsley were otherwise typical (and she is not), she should still be barred from serving as a class representative because of her obstruction of discovery on class certification and her violation of the Court-ordered class discovery cutoff date. This Court has inherent power to strike her class allegations for this misconduct. As the Court held in *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 300 F. Supp. 3d 1073 (S.D. Cal. 2017), "based on its inherent powers, a ***court may strike*** material from the docket, including ***portions of a document***, reflecting procedural impropriety or ***lack of compliance with court rules or orders***." *Id.* at 1080 n.3.[6] Proceeding as a named plaintiff in a class action is a privilege, not a right. By blocking discovery, Plaintiff has demonstrated she is not entitled to the privilege of representing others in this case.

### E.   Class Counsel Are Not Adequate.

Rule 23 lists four factors that the court must consider in appointing class counsel: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law;

---

[6] *Ferdik v. Bonzelet*, 963 F.2d 1258, 1260 (9th Cir. 1992) (quoting *Thompson v. Housing Auth.*, 782 F.2d 829, 831 (9th Cir. 1986), cert. denied, 479 U.S. 829, 93 L. Ed. 2d 60, 107 S. Ct. 112 (1986)) (upholding district court's dismissal of an action for failure to comply with an order of the court); *Bartley v. Japan Processing Serv. Co.*, No. 11-cv-2759-BAS(JLB), 2016 U.S. Dist. LEXIS 78131, at *4-6 (S.D. Cal. June 15, 2016) (action dismissed without prejudice where case pending for five years).

and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). "A district court must also ensure that class counsel will fairly and adequately represent the interests of the class, and may consider any other matter pertinent to counsel's ability in order to do so." *Sheinberg v. Sorensen*, 606 F.3d 130, 132-33 (3d Cir. 2010) (internal quotation marks and citations omitted).

In addition, proposed lead counsel must also demonstrate their adequacy and ability zealously to prosecute the action. These are evidence-based showings on which the class representative bears the burden of proof. They will not be presumed, and the evidence must enable the court to conduct its required rigorous analysis. *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532 (N.D. Tex. 2005).

Neither of the law firms vying to represent the putative class has shown they are adequate in this case. They have not made any attempt to explain or justify the obvious inadequacy of their discovery responses, or why they included two products that do not contain the challenged ingredients. They do not explain why they effectively blew off the Court-ordered class discovery cutoff date and refused to make Hilsley available for deposition until nearly a month later. Both firms go on at length about their experience in other class actions, which, if anything, makes their misconduct in this case even more inexcusable, because they should have known better than to play such games.

To provide but one example, there is no explanation from any of these experienced class action plaintiff lawyers for the position they gave in meet and confer conferences that one justification for their non-substantive discovery responses was that it was premature to propound contention interrogatories. They had no support for this position, nor any suggestion of when it would be time to propound such interrogatories. [Shackelford Decl., ¶9.] The net result is that Hilsley and her counsel have done all they can up to this point to make the case more expensive and more difficult to move forward. Such antics are bad enough on behalf of a single plaintiff. They are not to be rewarded by certifying a class so that the costs of litigation can be driven up even further.

Judge Alsup has pointed to the antics of proposed class counsel in pre-certification

discovery as a basis to find counsel inadequate.  In *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572 (N.D. Cal. 2007), the court found proposed class counsel inadequate because they had inexplicably delayed in propounding discovery to the defendant.  Ocean Spray submits that the failure of counsel here to provide any meaningful, substantive discovery responses at all, much less prior to the court-ordered class discovery cutoff date, is even more egregious.  However, that misconduct pales in comparison to the two attorneys who sat idly by while Hilsley gave demonstrably false deposition testimony.  Ocean Spray will not hazard a guess as to why two lawyers sat by while their client dug a hole with false testimony. But whatever the reason, they disqualified themselves from representing any class in this case.

Neither Hilsley nor her counsel are adequate to represent any class.  Ocean Spray submits that their collective shortcomings in discovery are sufficiently disqualifying on their face to deny certification.

## III.   HILSLEY'S SHOWINGS UNDER RULE 23(B) DO NOT WITHSTAND RIGOROUS ANALYSIS

### A.   Common Issues Do Not Predominate.

For the same reasons that Hilsley cannot demonstrate commonality under Rule 23(a), common issues do not predominate in Hilsley's made-up class.  Fed. R. Civ. P. 23(b)(3).   Hilsley's failure to present evidence of whether malic and fumaric acid function as flavors in any of the products at issue is the death knell of her motion.  This one issue pervades each one of her claims, but rather than address that issue, her motion drifts off into a discussion of cases dealing with consumer perception that have nothing to do with this case.  Indeed, her discussion of consumer perception is bizarre in light of her purported expert's survey work, which asks no questions whatsoever about malic or fumaric acid, much less whether anyone thought either of them was a flavor or what the flavor was.  Ocean Spray makes the point merely to underscore the disconnectedness of Hilsley's arguments in light of the precious little evidence she offers.

As noted above, Hilsley cannot even meet the low bar of commonality, because

not all of the products in the laundry list for which she seeks certification even contain malic or fumaric acid. She has made no meaningful attempt at all to meet the much more exacting showing required for predominance. She has identified a wide range of products from 100% juice blends to kids' drinks with as little as 5% juice. She has identified products with a range of calorie options. And perhaps most important, she has identified a list of products with many different flavor profiles, yet she tries to knit them together by claiming that malic acid and/or fumaric acid provide this wide range of flavors, even though she has no clue what flavor malic acid has. Merely to state her proposition is to refute it, so Hilsley faced a steep hill to show that common issues predominate. She has offered no evidence to meet that burden. Even worse, she has used untested and unsupported assumptions to plug holes in her evidence. Specifically, Dr. Goedde merely assumed that other products he identifies as "all natural" do not have any artificial ingredients that function as flavors. Yet several of his purported "competing" products have citric acid listed as an ingredient. Citric acid is another acidulant, like malic acid and fumaric acid, but Dr. Goedde has no idea whether the citric acid in any of those products is used as a flavor (as opposed to controlling pH), or if it derives from natural sources. [Fritz Decl., ¶19.] For these and other reasons, Hilsley's meager showing of predominance cannot withstand a rigorous analysis.

**B.** **Plaintiff's Damages Theory Does Not Satisfy *Comcast*.**

**1.** **Plaintiff's Purported Consumer Survey Asked the Wrong Questions.**

Plaintiff's consumer survey from Dr. Belch purports to measure consumer preference for juices that do not contain artificial flavors. His work, like this entire case, has simply ***assumed*** the key issue to be proved: namely, that the fumaric and/or malic acids in Ocean Spray products function as flavors. Indeed, Dr. Belch – whose CV demonstrates no expertise in food ingredients or product formulation at all – is quite up front about the question-begging nature of his work: "It is my understanding that the plaintiff relied upon deceptive labeling on the Ocean Spray Cran-Apple and Cran-Grape

products regarding the use of artificial flavoring for these products.  The plaintiff was not aware of the fact that the products contained artificial flavoring and purchased them with the understanding that they were naturally flavored with no artificial ingredients." [Belch Decl., ¶6.]  Nowhere in his 50-question survey are respondents asked anything about either malic acid or fumaric acid; he merely focuses on generic "artificial flavors."  Thus, he has no idea how many of his survey respondents believed that malic acid or fumaric acid are artificial flavors, an error compounded by his failure to display the ingredient statement (and thus rendering his survey completely useless as a consumer impression survey about whether reasonable consumers understand those ingredients to be artificial flavors).  For all we know, his entire survey population knows that these ingredients ***are not artificial flavors***, and thus were answering questions about other, generically described "artificial flavors."  He cannot possibly have an opinion about that, because he did not test or control for it.  As a result of these shortcomings, Dr. Belch's work is irrelevant and should be disregarded in its entirety.

In considering and ruling upon a motion for class certification, a court must subject the plaintiff's submission to a rigorous analysis, including any expert opinions offered in support of the motion.  *E.g. Costco*, 657 F.3d at 983-83 (court must subject expert declarations to rigorous analysis even after concluding opinions are admissible); *See also Chen-Oster v. Goldman, Sachs & Co*., 114 F. Supp. 3d 110, 114 (S.D.N.Y 2015) (noting "rigorous analysis" standard and stating "relaxed evidentiary standards would be inconsistent with this prescription.")  Even without considering a full *Daubert* challenge, courts must determine that expert opinions are admissible under the Federal Rules of Evidence, including Rule 702.  This entails a three-part inquiry: (i) are the opinions relevant; (ii) is the expert qualified; and (iii) are the opinions based upon a sufficiently reliable foundation.  *See Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co*., 301 F.R.D. 116, 127 (S.D.N.Y. 2014).  This latter inquiry includes "(1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of

error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Id. quoting Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002). Thus, expert evidence submitted at class certification is subject to the same standards of admissibility as at any other stage of litigation. *Costco*, 657 F.3d at 982 (noting that trial court "correctly applied" *Daubert* standard to expert declarations).

Without asking a single question about malic or fumaric acid, Dr. Belch's survey was on shaky ground from the very beginning, because he was trying to extrapolate conclusions from data he did not collect or test. The Supreme Court has warned about the limitations on such efforts:

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*G.E. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997). *Accord Costco*, 657 F.3d at 983 ("Thus, an expert's 'inference or assertion must be derived by the scientific method' to be admissible.") *quoting Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 113 S. Ct. 2786, 2795 (1993).

These shortcomings are fatal to Dr. Belch's survey, but they are not the only design flaws. First, Dr. Belch acknowledged that the consumers of Ocean Spray products skew slightly more female and a bit older. [Belch Report, ¶14.] This finding is particularly critical, because Dr. Belch's survey only included people who responded that they had purchased Ocean Spray "cranberry juice." All others were screened out by design. [Belch Report, p. 44, question 11; see also Report, ¶14 ("In order to qualify for participation in the survey, respondents had to indicate that they had purchased Ocean Spray cranberry juice in the past six months.").][7] Cranberry juice has long been studied

---

[7] This limiting factor also explains why Dr. Belch's survey does not match the entire list of products identified in Plaintiff's Complaint or her class motion. For example, one product identified in the Complaint is called "Ocean Spray 100% Apple juice drink. A

and reported to support urinary tract health.  [Fritz Decl., ¶7.]  His key question in the
survey asks "The label states that Ocean Spray Cran-Apple / Cran-Grape juice has no
artificial flavors.  If Ocean Spray Can-Apple / Cran-Grape juice was artificially flavored,
would this have an influence on the price you would be willing to pay for this product?"
A respondent taking this survey on-line could easily interpret this question to mean that
the cranberry juice was being replaced with an artificial flavor – which would be an
entirely different product – thus removing the health-related reason for buying the
product in the first place.  Even more astonishing, his survey asked questions about
whether the products were high in nutritional value and whether they were a healthy
product, all the while denying the ability to look at either the nutrition facts or the
ingredient list, which are legally-required elements of the label.

   This last flaw appears throughout Dr. Belch's survey.  All of his various renderings
of Ocean Spray bottles depict only the front, or principal display panel, or his mock-up of
that panel.  This is grossly misleading, because loyal Ocean Spray consumers know that
the various cranberry blends contain 15% juice, while the flagship Cranberry Juice
Cocktail contains 27% juice.  That percent juice declaration is a mandatory part of the
label pursuant to 21 C.F.R. § 101.30(b)(1).  However, the percent juice declaration is not
required to appear on the principal display panel.  21 C.F.R. § 101.30(f) ("The percentage
juice declaration may also be placed on the principal display panel, provided that the
declaration is consistent with that presented on the information panel.")  By showing his
survey takers bottles with no percent juice declaration visible, and no nutrition facts panel
or ingredient list, Dr. Belch effectively was telling them that the juices – which
indisputably flavor the products – ***had been removed and replaced with artificial
flavors***.  By omitting critical, legally-required label information from his survey,
Dr. Belch was not testing the pricing impact of the "natural flavors" messaging at all.  He

---

100% apple juice product does not contain cranberry juice.  His survey question asking
about "cranberry juice" would only accurately include Ocean Spray 100% Pure
Unsweetened Cranberry Juice, a product that contains no malic or fumaric acid.  [Fritz
Decl., ¶20.]

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

was instead measuring consumer reaction to a completely different "juice" product that contained no juice and only artificial flavoring – a product Ocean Spray does not make. [Fritz Decl., ¶10.]  This bogus message is particularly reinforced in Dr. Belch's mock-up model, which features the expression "Artificially Flavored" on the principal display panel, in letters larger than anything but the brand and product names.  Dr. Belch cites no regulation to suggest that such a message would be required to be presented in such shockingly large font on the principal display panel of any product.  Nor does he identify any real-world proxies for such messages.[8]  Moreover, the giant "Artificially Flavored" message is several font sizes larger than Ocean Spray's actual "no artificial flavors" message, another misleading trick that doubtless had the effect, if not the actual intent, of skewing the results of Dr. Belch's "survey" in a direction that could only favor plaintiff.

Second, Dr. Belch's report makes the same mistake of conflating what the labels say with what they do not say.  In his own words, Dr. Belch states: "The results of the questions regarding the importance of the images and information on the Cran-Apple and Cran-Grape labels clearly show that consumers consider whether Ocean Spray Cranberry juice products have ***artificial ingredients*** when evaluating them for purchase."  [Belch Report, ¶ 24 (emphasis added).]  Dr. Belch has no legitimate basis for saying any of this. Ocean Spray never made a "no artificial ingredients" claim on any of the products at issue.  Moreover, Dr. Belch never showed the legally-required ingredient statement in any of his pictures, so he has no basis whatsoever to comment on the impact of "ingredients," as opposed to the impact of various elements on the principal display panel in isolation from other, legally-mandated information.  Under applicable regulations, "flavors" and "ingredients" are not interchangeable terms.  Nothing he actually tested supports his opinion.  It is mere *ipse dixit* and should be rejected as such.

Finally, the purported test product Dr. Belch chose was utterly inappropriate.  The

---

[8] A review of Dr. Belch's CV shows no experience whatsoever in food labeling regulations.  His recitation of articles, courses and training seminars reveals nothing ever approximating expertise in this highly-regulated area.  Omitting legally-required elements of a food label is a critical mistake.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Ocean Spray Cran-Apple and Cran-Grape products he tested are both multi-juice drinks that contain less than 100% juice.  His purported "test" product was a 100% juice, single juice product – in other words, a very different product.  Moreover, that product's label contained further confounding messages like "Non GMO" and "no sugar added," which merely added in additional matters that Dr. Belch made no effort to control for.

Dr. Belch's work is textbook junk science.  As plaintiffs point out, in a purported false advertising case under California law, the key evidence is the advertising itself.  *Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003).  Yet Dr. Belch's experiment denied access to substantial portions of the "advertising" by showing only the principal display panel, and not showing the legally-required portions of the product labels.  The California Supreme Court has bluntly stated that "labels matter."  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011).  That means the ***whole label***, not just the principal display panel minus legally-required information that directly impacts the information being tested, and especially not doctored up labels that omit material information and which have no basis in reality.  *See Freeman v. Time, Inc.*, 68 F.3d 285, 290 (9th Cir. 1995) (challenged advertising must be examined in full context).

## 2. Dr. Goedde's Price Premium Model is Fatally Flawed.

Plaintiff relies upon the purported price premium analysis of Dr. Goedde as well.  Dr. Goedde looked at a variety of different kinds of "juice," which are displayed in a variety of different locations within different retailers, in order to come up some sort of "price per ounce" for "juices" that do and do not contain "artificial flavors" – a fact he allegedly determined by looking at the "labeling list or list of product ingredients."  In his words, "If a product had no words indicating artificial ingredients or flavorings, or was labeled 'all natural,' the product was characterized as natural.  In other words, he assumed, without justification, that the labels on every other product were truthful.

It does not appear from Dr. Goedde's CV that he has the experience required for this engagement.  He has no background in food science, food labeling or ingredient technology.  His only listed expert engagement in any sort of food litigation was in 2010,

in the case *Weiner v. Snapple*, Case No. 07-cv-8742, in the Southern District of New York.  There, as here, Dr. Goedde's opinion was put forward at class certification on behalf of a putative plaintiff class seeking to demonstrate a retail "price premium" created by an "all natural" message.  In *Weiner*, Dr. Goedde's opinions were excluded as being "unreliable," in part because he was unable to identify appropriate comparison products.  *Weiner v. Snapple, Inc.,* No. 07-cv-8742-DLC, 2010 U.S. Dist. LEXIS 79647 (S.D.N.Y. Aug. 5, 2010), at *25-27.

Dr. Goedde's efforts at identifying appropriate comparison products have not improved with time or from the lessons one would expect to learn from having one's opinions excluded as unreliable.  Here, Hilsley seeks to certify a class of purchasers of a laundry list of products that have little in common besides being liquid and bearing the Ocean Spray name.  The Ocean Spray products at issue are typically sold in the center aisles of grocery stores along with other shelf-stable juices.  Products in that area, like all of Ocean Spray products, generally contain juice made from concentrate.  Yet Dr. Goedde's "analysis" includes no fewer than 3 different brands of premium, not from concentrate orange juice sold in the refrigerated sections of stores.  He also includes a variety of other 100% juice products in the chilled case, including blends from Dole, Minute Maid, Simply and Florida's Natural, which are different product lines from the shelf stable products Ocean Spray sells.  He measures his "premium" based upon grocery store prices on three days in August, 2018 – ***more than two years after Hilsley stopped buying Ocean Spray products.***  His opinion tells us nothing about prices in 2016 and before, while Hilsley was still buying.  Essentially, he has simply assumed that "juice is juice," without any justification, and without any effort to compare 100% juice products to one another, single strength juices to only other single strength juices, as opposed to blends, or, worse yet, diet products to full calorie products.  His opinions are essentially based upon an unsophisticated, ***and untested***, notion that these and all other factors cancel one another out, so that any differences is retail prices are solely attributable to the difference between "artificial and natural."  Little wonder his opinions were excluded in

his only other food case.  It is the burden of plaintiff at class certification not merely to claim, but to demonstrate that her expert's chosen damages model actually controls for all other factors, and is able to isolate any claimed "price premium" to only the challenged label elements.  *See Brazil v. Dole Packaged Foods, LLC*, No. 12-cv-01831-LHK, 2014 U.S. Dist. LEXIS 157575, at *41 (N.D. Cal Nov. 6, 2014) (granting motion to decertify damages class based upon shortcomings in expert's damage model, which failed to control for relevant factors).

But it actually gets worse.  Several of the other products Dr. Goedde calls naturally flavored contain citric acid in their ingredient declaration.  Dr. Goedde offers no explanation for how he can possibly isolate the retail price impact of Ocean Spray's "no artificial flavors" claim without better information about his competitor products, including the function and source of the citric acid in many of them.  He not only "doesn't know what he doesn't know," it apparently has not occurred to him that there are things he does not know – the same reason that caused his opinions to be excluded in *Snapple*.  His only apparent criterion for identifying comparison products is stated in paragraph 9 of his report: "I conducted a survey of published juice prices during the period August 1 through August 3, 2018 appearing in retail chain stores in Southern California."  [Goedde Decl., ¶9.]  This basis for "comparing" such diverse assortment of products, retailing concepts, juice percentages and other attributes is no more reliable than his previous effort as a damages expert in a food labeling case, which could explain why Hilsley's counsel ***ignored Ocean Spray's request to depose her experts*** and cross-examine both of them on the flaws in their reports in order to aid the Court in its rigorous analysis.  Goedde's report is so deficient that should meet the same fate as his last effort and be excluded.  Hilsey's efforts to present an adequate damages model fail.

## C.   <u>Injunctive Relief Is Not Warranted Here Because Hilsley Would Not Buy The Products Again</u>.

Finally, Hilsley's request to certify a class under Rule 23(b)(2) for injunctive relief is unwarranted, because she lacks standing to pursue a claim for injunctive relief.  The

Ninth Circuit recently clarified the standing issue in *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018).  In that case, the court held that the class plaintiff had adequately alleged a basis for standing to pursue injunctive relief because she still desired to purchase the product as advertised.  *Id.* at 971-72.  In contrast, Hilsley has no desire to purchase products containing either malic acid or fumaric acid, whether from Ocean Spray or otherwise, no matter what the label says.  [Hilsley depo. at 119:4-24.]  She would only purchase different products in the future, which Ocean Spray has no obligation to make.  But merely changing the label would not cause her to buy the products again if they used either of the two acidulants, regardless of what function they serve.  Thus, certification under Rule 23(b)(2) for injunctive relief would be inappropriate, because Hilsley would not be a member of a class benefited by such relief.

## IV.   **CONCLUSION**

Plaintiff Hilsley's motion for class certification should be denied.  There are no common issues because the disputed ingredients are not used as flavors.  The deeply flawed expert models simply assume, but do not address or prove, that they are used as flavors.  Ms. Hilsley has the right to her own private opinions as a "heath coach" and "label guru" but she is not an adequate or appropriate representative for a class of ordinary consumers who have been buying Ocean Spray juice products for decades because they are healthy and taste great.  Arnold Worldwide had nothing whatsoever to do with malic or fumaric acid and no class can be certified against it.

Dated:  September 7, 2018

Respectfully submitted,

GREENBERG TRAURIG, LLP


By:   _/s/:  Rick L. Shackelford_
    Rick L. Shackelford
    Adam Siegler
Attorneys for Defendants
Ocean Spray Cranberries, Inc. and
Arnold Worldwide, LLC