UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL HILSLEY, on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>OCEAN SPRAY CRANBERRIES, INC.; ARNOLD WORLDWIDE LLC; and DOES defendants 1 through 5, inclusive,<br><br>                    Defendants. | Case No.: 17cv2335-GPC(MDD)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTING CLASS COUNSEL**<br><br>**[Dkt. No. 23.]** |

Before the Court is Plaintiff's motion for class certification and to appoint class counsel. (Dkt. No. 23.) Defendants filed an opposition, and Plaintiff filed a reply.[1] (Dkt. Nos. 30, 35.) Pursuant to the Court's order, Plaintiff filed a supplemental brief on damages. (Dkt. No. 75.) Defendant filed its response to the supplemental brief. (Dkt. No. 79.) Upon review of the papers, supporting documentation, and the applicable law,

---

[1] After the reply was filed, Defendants filed a notice of supplemental authority on October 3, 2018. (Dkt. No. 47.) On October 9, 2018, Defendants also filed objections to Plaintiff's late-filed evidence in support of her reply. (Dkt. No. 60.)

the Court GRANTS in part and DENIES in part Plaintiff's motion for class certification and appoints class counsel.

## Background

The action was removed to this Court pursuant to the Class Action Fairness Act of 2005 on November 16, 2017. (Dkt. No. 1.) Plaintiff Crystal Hilsley ("Plaintiff" or "Hilsley") brings a purported consumer class action against Defendants Ocean Spray Cranberries, Inc. and Arnold Worldwide LLC (collectively "Defendants") for violations of California consumer protection laws based on misrepresentation of labels stating "no artificial flavors" on certain Ocean Spray products. (Dkt. No. 1-2, Compl.) Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray") manufactures, distributes, advertises, markets and sells a variety of juices and juice-based beverage products. Defendant Arnold Worldwide LLC ("Arnold") participates in the labeling and advertising of these products for Ocean Spray. (Id. ¶ 6.) More specifically, the labels on Defendants' juice-based beverage products labeled "Cran-Apple" and "Cran-Grape" (collectively the "Products") state "No . . . artificial flavors"[2] when in fact they contain artificial flavoring chemicals that simulate the advertised fruit flavors. (Id. ¶¶ 7, 8, 9, 22.)

The Cran-Apple Product lists "malic acid" as an ingredient which Plaintiff contends is an artificial flavor. (Id. ¶¶ 23, 28.) Malic acid is not a natural flavoring material but "a synthetic chemical manufactured in a petrochemical factory from petroleum feedstocks." (Id. ¶ 24.) Natural malic acid, also known as l-malic acid, is found naturally in some fruits and vegetables but Ocean Spray uses a synthetic manufactured flavoring chemical called dl-malic acid. (Id. ¶¶ 31, 32.) Dl-malic acid is

---

[2] Plaintiff filed a request for judicial notice of Defendants' Product Labels that are the subject to this litigation. (Dkt. No. 23-23.) Defendants do not oppose. Federal Rule of Evidence 201 provides for judicial notice of facts that are not subject to reasonable dispute because they are either "generally known" or "can be accurately and readily determined by reference to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Product labels may be judicially noticed. See Kanfer v. Pharmacare US, Inc., 142 F. Supp. 3d 1091, 1098-99 (S.D. Cal. 2015). Accordingly, the Court GRANTS Plaintiff's request for judicial notice.

made in petrochemical plants from benzene or butane "after an intermediate conversion to maleic anhydride through a series of chemical reactions involving toxic chemical precursors and byproducts." (Id.) Moreover, according to Plaintiff, malic acid is an artificial flavor as defined under federal and California law. (Id. ¶¶ 34, 35.) Malic acid gives a "tart, fruit" flavor to food products. (Id. ¶ 38.)

The Cran-Grape product is also flavored with "fumaric acid" which is also artificially synthesized. (Id. ¶¶ 52, 53.) It is derived from petrochemicals, not from natural source materials and constitutes an artificial flavor. (Id. ¶ 53.) Grapes naturally contain fumaric acid but Ocean Spray uses a synthetic fumaric acid to simulate the flavor of grapes in the product. (Id. ¶ 56.) Like dl-malic acid, fumaric acid simulates, resembles and reinforces the characterizing flavors for the Cran-Grape Product. (Id. ¶ 57.) California and federal laws require that food labels be labeled accurately. (Id. ¶ 43.)

Plaintiff alleges that each of the Products labeled "No . . . Artificial Flavors" are false and misleading because each Product contain artificial flavoring ingredients, either dl-malic acid, fumaric acid or both that simulate advertised fruit flavors. (Id. ¶¶ 8, 9, 10.)

Plaintiff purchased the 64-ounce Ocean Spray Cran-Apple Product occasionally from 2011 until 2013 and on a monthly basis from 2013 until December 2016. (Dkt. No. 23-19, Hilsley Decl. ¶ 4.) She also purchased the 64-ounce Ocean Spray Cran-Grape Product, the Ocean Spray "100% Apple" juice drink, and the Cranberry Juice Cocktail Products multiple times during the class period. (Id.) She read and relied on Ocean Spray's Products' labels when buying the products including the label "No artificial flavors or preservatives" and the fact that the labels failed to state that they contained artificial flavorings. (Id. ¶ 5.) Plaintiff would not have purchased the Products if she had known they contained artificial ingredients. (Id. ¶ 7.) She would purchase the Products again, in the future, if the labels were accurate and they contained "No artificial flavors or preservatives." (Id. ¶ 8.)

Plaintiff alleges six causes of action for violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*, the unlawful prong of the Unfair

Competition Law ("UCL"), Cal. Bus. & Professions Code section 17200 *et seq*., the unfair prong of the UCL, California's False Advertising Law, and breach of express warranty and breach of implied warranty.  (Id. ¶¶ 115-187.)

In the instant motion, Plaintiff seeks to certify a Class consisting of:

All California Citizens who purchased one of the following Ocean Spray Products, for personal and household use and not for resale, in California from January 1, 2011 until the date class notice is disseminated:

• Ocean Spray Cran Apple;
• Ocean Spray Cran Grape;
• Ocean Spray "100% Apple" Juice Drink;
• Ocean Spray Cranberry Juice Cocktail[3];
• Ocean Spray Wave Apple with White Cranberries;
• Ocean Spray Wave Berry Medley;
• Ocean Spray Cran Cherry;
• Ocean Spray Cran Pineapple;
• Ocean Spray Cran Pomegranate;
• Ocean Spray Diet Cran Pomegranate;
• Ocean Spray Diet Cran Cherry;
• Ocean Spray Cranberry Cherry Flavor 100% Juice.

Excluded from the Class are Defendants' current and former officers and directors, members of the immediate families of Defendants' officers and directors, Defendants' legal representatives, heirs, successors, and assigns, any entity in which Defendants have or had a controlling interest during the Class Period, and the judicial officers to whom this lawsuit is assigned.

(Dkt. No. 23-1 at 12.[4])

## Discussion

**A.     Legal Standard on Class Certification**

---

[3] In her reply, Plaintiff recognizes that Cranberry Juice Cocktail does not contain malic acid, as Defendant argues, and does not object to removal of this product from the Class definition.  In place, she seek to add Cran Raspberry juice product which contains malic acid.  (Dkt. No. 35 at 14 n. 4.)
[4] Page numbers are based on the CM/ECF pagination.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only. In order to justify a departure from that rule, a class representative must be a part of the class and possess the same interest and suffer the same injury as the class members." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks and citations omitted). A plaintiff seeking class certification must affirmatively show the class meets the requirements of Rule 23. <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1432 (2013) (citing <u>Dukes</u>, 131 S. Ct. at 2551-52). To obtain certification, a plaintiff bears the burden of proving that the class meets all four requirements of Rule 23(a)--numerosity, commonality, typicality, and adequacy. <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970 979-80 (9th Cir. 2011). If these prerequisites are met, the court must then decide whether the class action is maintainable under Rule 23(b). <u>United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union AFL–CIO, CLC v. ConocoPhillips Co.</u>, 593 F.3d 802, 806 (9th Cir. 2010). This case involves Rule 23(b)(3), which authorizes certification when "questions of law or fact common to class members predominate over any questions affecting only individual class members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). It also involves Rule 23(b)(2), which permits certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Court exercises discretion in granting or denying a motion for class certification. <u>Staton v. Boeing Co.</u>, 327 F.3d 938, 953 (9th Cir. 2003).

The Court is required to perform a "rigorous analysis," which may require it "to probe behind the pleadings before coming to rest on the certification question." <u>Dukes</u>, 131 S. Ct. at 2551. "'[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. More importantly, it is not correct to say a district court may consider the merits to the extent that they overlap with

class certification issues; rather, a district court must consider the merits if they overlap with Rule 23(a) requirements." <u>Ellis</u>, 657 F.3d at 981.  Nonetheless, the district court does not conduct a mini-trial to determine if the class "could actually prevail on the merits of their claims."  <u>Id.</u> at 983 n.8; <u>United Steel, Paper & Forestry, Rubber, Manufacturing Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC</u>, 593 F.3d at 808 (citation omitted) (court may inquire into substance of case to apply the Rule 23 factors, however, "[t]he court may not go so far . . . as to judge the validity of these claims.").  Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent – but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied" <u>Amgen Inc. v. Conn. Ret. Plans & Trust Funds</u>, 568 U.S. 455, 466 (2013).

**B.    Federal Rule of Civil Procedure 23(a)**

      **1.    Rule 23(a)(1) - Numerosity**

      Plaintiff argues that the class is sufficiently numerous to satisfy Rule 23(a)(1) as Ocean Spray admitted in its notice of removal that class members have made "millions of purchases of the twelve products" and the amount in controversy exceeds $5,000,000. (Dkt. No. 1, Not. of Removal at ¶ 24.)  In the notice of removal, Defendant also acknowledges that Plaintiff has alleged a putative class "substantially in excess of 100 persons."  (<u>Id.</u> at ¶ 11.)  Moreover, in their opposition, Defendants do not dispute numerosity.

      To establish numerosity, a plaintiff must show that the represented class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); <u>Bates v. United Parcel Serv.</u>, 204 F.R.D. 440, 444 (N.D. Cal. 2001).  A court may reasonably infer based on the facts of each particular case to determine if numerosity is satisfied. <u>Ikonen v. Hartz Mtn. Corp.</u>, 122 F.R.D. 258, 262 (S.D. Cal. 1988).  "As a general rule, classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough."  <u>Id.</u>

Based on Defendants' assertions in the notice of removal, and their non-opposition, the Court concludes that the class will number significantly more than 40 members and numerosity has been met.

### 2. Rule 23(a)(2) - Commonality

Next, Plaintiff argues that commonality is satisfied because common questions include whether Ocean Spray's "No artificial flavor" claims and its failure to disclose that the Products contain artificial flavor is likely to deceive; whether Ocean Spray communicated a representation, through its packaging and labeling, that its products contain "No artificial flavors"; and if so, whether that representation was material to individuals purchasing the Ocean Spray Products; if the representation was material, whether it was truthful; and if reasonable consumers who purchased Ocean Spray Products were deceived by a material misrepresentation, what is the proper method for calculating damages.

In response, Defendants argue there is no commonality because Plaintiff has provided no evidence that malic acid and fumaric acid function as flavors in these Products. Without evidence of a key threshold fact that malic acid and fumaric acid function as flavors, the causes of action in the complaint fail. Defendants explain that malic and fumaric acids do not act as flavors in their products but serve as non-flavored acidulants that control the acidity of the respective products. In reply, Plaintiff asserts that whether malic acid and fumaric acid function as artificial flavoring ingredients is a common question that is capable of classwide resolution.

As to commonality, Rule 23(a)(2) requires Plaintiff to show "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" Dukes, 131 S. Ct. at 2551. "That common contention . . . must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. "'What matters to class certification . . . is not the raising of common 'questions' . . .

but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" Id. (emphasis in original) (citation omitted). "[C]ommonality only requires a single significant question of law or fact." Mazza v. American Honda Motor Co., Inc., 666 F.3d 581, 589 (9th Cir. 2012) (commonality not disputed as to whether Honda "had a duty to disclose or whether the allegedly omitted facts were material and misleading to the public"); Rodriguez v. Hayes, 591 F.3d 1105, 1122 (9th Cir. 2010) (Commonality is satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.") (quoting Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994)). Commonality has been construed permissively. Ellis, 657 F.3d at 981.

In misbranding or false advertising cases, courts routinely find that commonality has been satisfied. See Astiana v. Kashi Co., 291 F.R.D. 493, 501-20 (S.D. Cal. 2013) (commonality satisfied concerning whether use of term "Nothing Artificial" that contain allegedly synthetic ingredients violates the UCL, FAL, CLRA, or the defendant's own warranties) (citing Chavez v. Blue Sky Natural Beverage Co., 268 F.R.D. 365, 377 (N.D. Cal. 2010) (commonality met as to whether the defendant's "packaging and marketing materials are unlawful, unfair, deceptive or misleading to a reasonable consumer")).

Here, Defendants do not dispute that there are common issues of fact and law to the class. Instead, they argue that a threshold issue must be resolved as to whether malic or fumaric acid constitute flavors in their Products. If malic and fumaric acids do not function as flavors, then it would be a death knell to Plaintiff's entire case.

On class certification, the Court does not resolve issues of disputed facts. Alcantar v. Hobart Serv., 800 F.3d 1047, 1053 (9th Cir. 2015) ("We conclude that the district court erred in denying class certification because it evaluated the merits rather than focusing on whether the questions presented—meritorious or not—were common to the class."). "A common contention need not be one that 'will be answered, on the merits, in favor of the class.' Amgen, 133 S. Ct. at 1191 . . . [i]t only 'must be of such a nature that it is capable

of classwide resolution.' <u>Wal-Mart</u>, 131 S. Ct. at 2551." <u>Alcantar</u>, 800 F.3d at 1053. In <u>Alcantar</u>, the Ninth Circuit held that the district court improperly concluded there was no commonality because the plaintiff had not offered any evidence demonstrating that the defendant had a uniform company-wide policy requiring technicians to commute in their service vehicles. <u>Id.</u> at 1053. The district court incorrectly concluded that "because there is no evidence to suggest that technicians were required to drive the service vehicles to their homes, the lack of a potential legal argument precludes a common issue of fact or law for purposes of Rule 23(a)(2)." <u>Id.</u> According to the Ninth Circuit, this conclusion requires too much of the plaintiff by demanding a common contention that "will be answered, on the merits in favor of the class" instead of simply showing there is a "common contention capable of classwide resolution." <u>Id.</u> The Ninth Circuit noted that if it is ultimately determined that the plaintiff fails to prove an element of his claim, it would generate a "fatal similarity" that would make the class action fair and efficient. <u>Id.</u>

Likewise, Defendants improperly ask the Court to make a determination on the merits of the case which is not proper at class certification. As directed by the Ninth Circuit in <u>Alcantar</u>, the Court's focus is on whether Plaintiff has presented a common contention capable of class wide resolution, not whether Plaintiff has provided evidence that fumaric and malic acids are flavors. Instead, whether fumaric and malic acids, as used in Defendants' Products, act as flavor ingredients is one contention common to the class. <u>See</u> <u>Rodriguez</u>, 591 F.3d at 1122 (at least one question of fact or law satisfies commonality). Thus, Plaintiff has demonstrated commonality.

Defendants also argue that the ingredient labels of 100% Apple Juice and Cranberry Juice Cocktail do not contain malic or fumaric acid. (Dkt. No. 23-6, Marron Decl., Ex. 3 at 14.) Consequently, Defendants argue that whether the challenged ingredients are even present is not common to all the products for which she seeks to certify. In response, Plaintiff acknowledges that Cranberry Juice Cocktail does not contain malic acid, and does not object to removal of this product from the Class definition but seeks to replace it with the Cran Raspberry juice product which does

contain malic acid. (Dkt. No. 35 n. 4.) Also, in response to the 100% Apple Juice label, Plaintiff refers to two websites that show that malic acid is an ingredient in the 100% Apple Juice Product. (Dkt. No. 35-7, Marron Decl., Ex. 6; Dkt. No. 35-8, Marron Decl., Ex. 7.[5]) While the 100% Apple Juice labels attached in support of Plaintiff's motion for class certification do not include the ingredients of malic acid or fumaric acid, the two websites pages attached in Plaintiff's reply state that malic acid is an ingredient in the 100% Apple Juice. Neither party has explained the discrepancy in the ingredients for the 100% Apple Juice Product. At this stage, Plaintiff has shown that malic acid may be an ingredient in the 100% Apple Juice. If it is later determined to not contain malic acid, the 100% Apple Juice can be removed from the Class Definition. In consideration of Plaintiff's request, the Court removes Cranberry Juice Cocktail from the Class Definition and replaces it with the Cran-Rasberry Juice product. Therefore, all products have the same "no artificial flavor" label statements and all contain either malic or fumaric acid. Accordingly, Defendants' argument that all Products do not contain malic or fumaric acid and defeats commonality is moot.

### 3. Rule 23(a)(3) - Typicality

Plaintiff asserts her claims are typical of those of the class members because she and all class members were exposed to the same misleading claims and omissions, were influenced by those claims and omissions and were injured in the same manner.

---

[5] On October 9, 2018, Defendants filed objections to these declarations as irrelevant and inadmissible hearsay. (Dkt. No. 60.) In considering a motion for class certification, strict adherence to the Federal Rules of Evidence is not required and inadmissible evidence may be considered. Gonzalez v. Millard Mall Servs., Inc., 281 F.R.D. 455, 459 (S.D. Cal. 2012) (citing Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 178 (1974)); Smith v. Microsoft Corp., 297 F.R.D. 464, 473-74 (S.D. Cal. 2014) (courts may consider inadmissible evidence in determining whether a class should be certified). Here, Defendants object to the two labels of 100% Apple Juice on third-party websites as not products purchased by Plaintiffs and are therefore, irrelevant. The screen shot is of the 100% Apple Juice product in a single serve and a 15.2 oz bottle. While Plaintiff alleges she purchased the 64-ounce juice products, it would be presumed that the contents of the 100% Apple Juice product would be the same whether in a single serve or 64-ounce bottle. At this stage, the Court considers these labels, presented in the reply, to challenge Defendants' argument in opposition that the 100% Apple Juice contains no malic or fumaric acid. Therefore, Defendants' objection is overruled.

Defendants argue that Plaintiff's guru-for-hire services as a "health coach" and "label guru" creates a financial incentive on her part that is not typical of other class members and create bias and credibility issues that could harm the interests of absentee class members. Plaintiff replies that Defendants misapprehend the typicality requirement which focuses on Defendants' conduct and Plaintiff's legal theories and not on her expertise or outside experience.

Under typicality, the Court must determine whether the claims or defenses of the representative parties are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (internal citation omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Id. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon, 150 F.3d at 1020. "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." Hanon, 976 F.2d at 508.

The Court agrees that Defendants' focus on the personal education and employment background of Plaintiff is not relevant in assessing typicality. The Federal Rules specifically note that the typicality inquiry is on the class representative's claims or defenses and whether they are typical of the class. See Fed. R. Civ. P. 23(a)(3). Here, Plaintiff has demonstrated that her claims are typical as the Complaint alleges that she and all class members purchased the Products, were deceived by the false and deceptive labeling and lost money as a result. (Dkt. No. 1-2, Compl. ¶ 105.) All class members were exposed to the same omission and affirmative misrepresentation on the labels of the

17cv2335-GPC(MDD)

Products.  (Id. ¶ 107.)  Therefore, the Court concludes that Plaintiff has established that her claims and injuries are typical of the claims and injuries of the class.[6]

### 4.    Rule 23(a)(4) - Adequacy

Plaintiff argues that she is an adequate class representative because she has no conflict of interest with other class members, she is aware of her obligations as a class representative, and she has prosecuted and will continue to prosecute the action vigorously on behalf of the class.  As for her counsel, Plaintiff contends that they are experienced in consumer protection class actions and other false advertising litigation, have no conflicts and will prosecute the action vigorously on behalf of the class.  Defendants respond that Plaintiff and her counsel are not adequate to represent any class primarily due to their conduct during discovery.

Rule 23(a)(4) provides that class representatives must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In analyzing whether Rule 23(a)(4) has been met, the Court must ask two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting Hanlon, 150 F.3d at 1020).

Defendants do not allege that Plaintiff and her counsel have any conflict of interest with other class members but appear to argue that they will not prosecute the action vigorously and raise other arguments not relevant to an adequacy inquiry.

First, Defendants argue that Plaintiff was recruited by counsel to be a class representative in this case.  Before being recruited by counsel, Plaintiff did not have an issue with Ocean Spray products and did not know she was being harmed by the

---

[6] Defendants also summarily argue that Plaintiff will be occupied with defenses unique to her but do not identify which defenses are unique to her and which would "threaten to become the focus of the litigation."  See Hanon, 976 F.2d at 508.  The Court declines to consider an issue not fully developed.

Products. She also had no prior legal relationship with her counsel who solicited her, did not interview any other potential law firms to represent her and conducted minimal research into her counsel. Plaintiff replies that even if her counsel recruited her, which she claims they did not, recruitment by counsel is not relevant to the adequacy analysis.

In a case where the plaintiff's counsel solicits professional employment for the purposes of filing a class action and violates the Rules of Professional Conduct, such violations do not make the plaintiff an inadequate class representative. Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1323-24 (11th Cir. 2008). Instead, the proper remedy for improper solicitation is disciplinary action and not denial of class certification. Id.; see also Zaklit v. Nationstar Mortg., LLC, 15cv2190-CAS(KKx), 2017 WL 3174901, at *14 (C.D. Cal. July 24, 2017) (a finding of solicitation does not undermine an adequacy finding); In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 108 (E.D.N.Y. 2012) (noting that courts have given less weight to solicitation by class counsel in determining whether a class should be certified); Ballan v. Upjohn Co., 159 F.R.D. 473, 488 (W.D. Mich. 1994) ("open solicitation is no longer frowned upon as in the past"). Thus, the alleged solicitation of Plaintiff by her counsel does not make her an inadequate representative for the class.

Second, Defendants argue that Plaintiff's refusal to answer interrogatories, refusal to produce documents, refusal to appear for a deposition, and her giving knowingly false testimony during her deposition make her an inadequate class representative. Relatedly, Defendants argue that Plaintiff's counsel are inadequate based on their failure to provide discovery responses, their refusal to make Hilsley available for deposition prior to the class discovery cut-off date, and allowing their client to give false deposition testimony. (Dkt. No. 30 at 20.) Plaintiff replies that Defendants sat on their discovery rights and the fault lies with them because they failed to seek assistance from the court.

"Delays in seeking class certification, a failure timely to prosecute the litigation, and any failure to comply with reasonable disclosure obligations or discovery requests are factors that suggest that the class representative is inadequate." Kandel v. Brother

Int'l Corp., 264 F.R.D. 630, (C.D. Cal. 2010) (citing cases) (class counsel inadequate where counsel repeatedly erred in ways that prejudiced or could have prejudiced the class had the Court not granted relief from counsel's error); Quinonez v. Pharm. Specialties, Inc., CV 16-5966 BRO(AGR), 2017 WL 4769436, at *3-5 (C.D. Cal. Aug. 10, 2017) (counsel was inadequate to protect interests of the plaintiff and the class based on numerous errors and repeated failure to comply with the federal rules, local rules and the court's standing order). Class counsel may be deemed inadequate based on repeated or numerous errors that could prejudice the class. See id.

In this case, Plaintiff's counsels' alleged misconduct in responding to discovery requests do not rise to the level of inadequate counsel for purposes of class certification. On June 1, 2018, Ocean Spray served its Request for Production of Documents and First Set of Interrogatories to Plaintiff. (Dkt. No. 30-2, Shackleford Decl. ¶¶ 4, 7.) On July 5, 2018, Plaintiff served her responses to both discovery requests and provided almost all the same response/objections to all 58 requests for production of documents and same response to all 24 responses to the interrogatories. (Id. ¶¶ 5, 8.) In response to most of the Request for Production of Documents she stated:

> Plaintiff incorporates by reference the general objections set forth above. Plaintiff further objects to this Request on the following grounds:
>
> Plaintiff objects to this Request to the extent that it seeks documents that are protected from disclosure by the attorney-client privilege and/or the attorney-work product doctrine. Plaintiff objects to this Request to the extent that it seeks the premature disclosure of expert materials and opinions. Plaintiff objects to this Request to the extent that it seeks documents that are neither relevant nor proportional to the needs of the case. Plaintiff objects to this request as a violation of her right to financial privacy.
>
> Discovery is ongoing and Plaintiff reserves the right to supplement this response as discovery proceeds.

(Dkt. No. 30-4, Shackleford Decl., Ex. 5, Response to Ds' RPD No. 1.) As to the interrogatories, Plaintiff responded as to every request as follows:

Plaintiff incorporates by reference the general objections set forth above. Plaintiff further objects to this Request on the following grounds:

Plaintiff objects to this Interrogatory to the extent that it seeks information that is protected from disclosure by the attorney-client privilege and/or the attorney-work product doctrine. Plaintiff objects to this Interrogatory to the extent that it seeks the premature disclosure of expert materials and opinions. Plaintiff objects to this Interrogatory to the extent that it seeks information that is neither relevant nor proportional to the needs of the case.

Discovery is ongoing and Plaintiff reserves the right to supplement this response as discovery proceeds.

(Dkt. No. 30-5, Shackleford Decl., Ex. 7, Response to Ds' Interrog. No. 1.) Only 1 document was provided in response to Defendant's Request for Production of Documents at Plaintiff's deposition. (Dkt. No. 30-4, Shackleford Decl., Ex. 5.) On July 19, 2018, counsel participated in a meet and confer telephone call about outstanding discovery issues and Plaintiff's counsel indicated no supplement would be provided on Plaintiff's interrogatory responses. (Dkt. No. 30-2, Shacklford Decl. ¶ 9.) Despite these outstanding discovery issues, Defendants did not seek assistance from the Court as provided in the Scheduling Order filed on March 9, 2018, (Dkt. No. 14), and under Federal Rule of Civil Procedure 37.

If Defendants deemed Plaintiff's responses and answers as non-responsive, after the meet and confer, they should have filed an appropriate discovery motion with the Magistrate Judge to resolve any discovery issues. (Dkt. No. 14, Sch. Order at 2) ("If the parties reach an impasse on any discovery issues, counsel shall file an appropriate motion within the time limit and procedures outlined in the Chambers Rules."). Moreover, Federal Rule of Civil Procedure 37 provides that a party may seek to compel discovery responses if a party fails to answer an interrogatory or fails to produce documents. Fed. R. Civ. P. 37(a)(3)(B).

Defendants' failure to invoke the discovery dispute procedures cannot be a basis for the Court to conclude that Plaintiff refused to provide discovery responses. Without a

17cv2335-GPC(MDD)

determination by the Magistrate Judge, the Court is not able to determine whether Plaintiff's responses were non-responsive. Plaintiff may, in fact, have had valid reasons for objecting to Defendants' discovery requests. Therefore, Defendants' argument that Plaintiff and her counsel are inadequate based on their failure to respond to discovery requests is without merit.

Moreover, Defendants complain that Plaintiff and her counsel's refusal to timely appear for her deposition make them inadequate. Defendants inquired about taking Plaintiff's deposition in late May, and again on June 27, 2018. Because Plaintiff's counsel was not responsive, on June 27, 2018, Defendants served a notice of deposition for Hilsley set for July 9, 2018, the class discovery cutoff date. (Id. ¶ 10.) On June 28, 2018, Plaintiff's counsel indicated they would not be available on July 9, 2018. (Id. ¶ 11.) Hilsley's deposition was eventually taken on August 4, 2018 past the deadline for class discovery. (Id. ¶ 14.) Again, Defendants failed to seek relief from the Magistrate Judge and the Court is unable to determine whether there was good cause for delaying Plaintiff's deposition.

Next, Defendants argue that Plaintiff knowingly provided false testimony in her deposition when she was asked about paragraph 68 of her complaint. Paragraph 68 of her complaint states,

> John Compton, the Chief Executive Officer of Ocean Spray's parent company, stated to investors at the Morgan Stanley Consumer & Retail Conference, "We have talked extensively to consumers about this idea, and they come back and tell us the number one motivation for purchase is products that claim to be all natural."

(Dkt. No. 1, Compl. ¶ 68.) Defendants assert that Ocean Spray does not have a parent company but the allegation is a statement made by a PepsiCo executive, which was asserted in one of the other malic acid cases filed by Plaintiff's counsel on behalf of a different named plaintiff. Plaintiff responds that there was a one-word drafting error in paragraph 68 and the word "parent" should have replaced with "partner" and Defendants'

attack on her for this error and accusing her of providing "knowing false testimony" is preposterous.

Defendants' citation to <u>CE Design Ltd. v. King Architectural Metal, Inc.</u>, 637 F.3d 721, 727-28 (7th Cir. 2011) is not supportive. In that case, a discrepancy concerning a key issue in the testimony of the president of a class action plaintiff business firm raised serious doubts concerning adequacy. <u>Id.</u> In this case, paragraph 68 is merely background information and not a key element of a cause of action. Years ago, the United States Supreme Court affirmed class certification where the named plaintiff "knew nothing about the content of the suit,". . . "but did know . . . that she had put over $2,000 of her hard-earned money into Hilton Hotel stock [and] that she was not getting her dividends." <u>Surowitz v. Hilton Hotels Corp.</u>, 383 U.S. 363, 370, 372 (1966); <u>see also</u> <u>Buus v. WAMU Pension Plan</u>, 251 F.R.D. 578, 587 (W.D. Wash. 2008) ("Although Weber may be unsophisticated and not fully aware of the facts of the case, that alone is not a bar to class certification."). Another court also explained, "[f]or an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." <u>Dubin v. Miller</u>, 132 F.R.D. 269, 272 (D. Colo. 1990).

Here, the fact that Plaintiff did not know who John Compton was, which was related to background information in her complaint, does not rise to the level of egregious conduct to make her an inadequate class representative. (Dkt. No. 30-3, Shackleford Decl., Ex. 1, Hilsley Depo. at 114:7-24.) Instead, the record shows that Plaintiff is otherwise fully informed about the case. (Dkt. No. 23-19, Hilsley Decl. ¶¶ 9, 10.) She has remained in contact with her attorneys throughout the litigation and kept informed of the status of the case. (<u>Id.</u> ¶ 9.) She understands the responsibilities of a class representative, which include acting on behalf of the Class's best interest, staying involved, being informed about the case, and actively participating in it including making herself available at trial. (<u>Id.</u> ¶ 10.) She also testified that she spent about six or seven

hours going over the information contained in the complaint. (Dkt. No. 30-3, Shackleford Decl., Ex. 1, Hilsley Depo. at 70:6-19.)

Finally, Defendants argue that her "self-styled expertise" disguises a lack of knowledge because she failed to produce peer-reviewed scientific papers she had claims she studied. However, they provide no specific legal support that a class representative needs to provide peer-reviewed scientific papers about the underlying issues in the litigation. Defendants' argument is not supported.

In sum, the Court concludes that Plaintiff has demonstrated adequacy as to herself as a class representative, and as to her counsel.

## C.    Federal Rule of Civil Procedure 23(b)(3)

Under Rule 23(b)(3), the plaintiff must demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" and that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance is satisfied "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." Hanlon, 150 F.3d at 1022 (quoting Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1777 (2d ed. 1986)). In addition, class damages must be sufficiently traceable to the plaintiff's liability case. See Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013).

### 1.    Predominance

Plaintiff argues that common issues predominate concerning her claims under California's CLRA, UCL and FAL because the issue is whether Defendants misrepresented the Products and whether the misrepresentations were likely to deceive a reasonable consumer.   As to the breach of express warranty claims, Plaintiff maintain that Ocean Spray made the same warranty to every class member that their Products contained "No artificial flavors"; therefore, resolution of the issue only requires whether the "No artificial flavors" is an express warranty, and if so, whether the Products

18

conforms to the promises and descriptions on the labels. Similarly, she argues that the breach of warranty standard is the same as the breach of implied warranty of merchantability.

Defendants argue that predominance has not been met for the same reason why they claim that commonality was not met. They contend that because Plaintiff has failed to present evidence that malic and fumaric acids function as flavors in the products at issue, it is a "death knell" to her motion as it pervades each of the claims. (Dkt. No. 30 at 21.)

"Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen, Inc., 568 U.S. at 466. "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." Id. at 459. It only "must be of such a nature that it is capable of classwide resolution." Wal–Mart, 131 S. Ct. at 2551 (emphasis added); see Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."). As discussed on the commonality factor, merit questions are not appropriate at the class certification stage. See Amgen, 568 U.S. at 459; Alcantar, 800 F.3d at 1053. Rule 23(b)(3) requires a showing that questions common to the class predominate, not whether Plaintiff has proven her case. Therefore, contrary to Defendants' argument, Plaintiff's burden at this stage it not to establish that malic and fumaric acids function as flavors but to establish whether "questions of law or fact common to class members predominate over any questions affecting only individual members." See Fed. R. Civ. P. 23(b)(3).

"The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045

(2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2012)).
"When 'one or more of the central issues in the action are common to the class and can
be said to predominate, the action may be considered proper under Rule 23(b)(3) even
though other important matters will have to be tried separately, such as damages or some
affirmative defenses peculiar to some individual class members.'" Id. (quoting 7AA C.
Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed. 2005)).

Here, Defendants do not challenge Plaintiff's predominance argument that
common issues predominate on her legal claims. Plaintiff's UCL, FAL and CLRA
claims depend on whether the labels are "unlawful, unfair, deceptive, or misleading to
*reasonable* consumers", an objective standard. Werdebaugh v. Blue Diamond Growers,
Case No. 12cv2724-LHK, 2014 WL 2191901, at *12 (N.D. Cal. May 23, 2014)
(emphasis in original). Each of the three statutes allows "plaintiffs to establish
materiality and reliance (i.e., causation and injury) by showing that a reasonable person
would have considered the defendant's representation material." In re ConAgra Foods,
Inc., 90 F. Supp. 3d 919, 983 (C.D. Cal. 2015) (citations omitted). A plaintiff does not
need to demonstrate individual reliance. Id. Therefore, these causes of action requiring
an objective test make such claims amenable to class actions. Tait v. BSH Home
Appliances Corp., 289 F.R.D. 466, 480 (C.D. Cal. 2012). Similarly, for a breach of
express warranty claim,[7] a plaintiff need not prove reliance on specific representations.
Id. at 984. Because each of the elements are subject to common proof, common issues
predominate over individual ones on the UCL, FAL, CLRA and breach of express
warranty.

On a claim of breach of implied warranty, a plaintiff must demonstrate that goods
are "fit for the ordinary purpose for which such goods are used." Cal. Comm. Code §

---

[7] "To prevail on a breach of express warranty claim under California law, a plaintiff must prove that:
'(1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2)
the statement was part of the basis of the bargain; and (3) the warranty was breached.'" In re ConAgra
Foods, Inc., 90 F. Supp. 3d at 984 (citation omitted).

2314(2)(c). California requires that a plaintiff alleging a breach of implied warranty claim be in vertical privity with the defendant. Clemens v DaimlerChrysler Corp., 534 F.3d 1017, 1023 (9th Cir. 2008) (a consumer who buys from a retailer is not in privity with the defendant manufacturer); In re ConAgra Foods, 90 F. Supp. 3d at 986. An exception to the privity requirement exists but only as to breach of express warranty, and not breach of implied warranty.[8] Burr v. Sherwin Williams Co., 42 Cal. 2d 682, 696 (1954) ("[T]he . . . exception, where representations are made by means of labels or advertisements, is applicable only to express warranties.").

The Complaint alleges breach of implied warranty under the California Commercial Code, (Dkt. No. 1-2, Compl. ¶¶ 172-186), which provides for an implied warranty that goods '[a]re fit for [the] ordinary purposes for which such goods are used.'" Cal. Com. Code § 2314(2)(c). Because vertical privity is required between the plaintiff and the defendant, and because Plaintiff and class members purchased the Products in retail stores, individual inquiries will be predominate to determine if there is vertical privity between class members and Defendants. See In re ConAgra Foods, 90 F. Supp. 3d at 986-97 (individual issues predominate over common ones on breach of implied warranty); Allen v. Hyland's, Inc., 300 F.R.D. 643, 670 (C.D. Cal. 2014) (no predominance for breach of implied warranty because each class member will be required to demonstrate he or she is in vertical privity with the defendant).

In conclusion, the Court concludes that Plaintiff has demonstrated that questions common to the class predominate over any individual questions affecting members as to

---

[8] District courts have noted the ambiguity as to when the exception to vertical privity applies. In Clemens, the Ninth Circuit implied that the exception to vertical privity based on written labels or advertisements of a manufacturer applies to breach of implied warranty but relies on Burr, a California Supreme Court case that specifically limited the exception to breach of express warranty. See In re ConAgra Foods, Inc., 90 F. Supp. 3d at 986 n. 201; Allen, 300 F.R.D. at 669 n. 24. These courts have declined to recognize a vertical privity requirement for a breach of implied warranty claims based on written labels or advertisements. The Court follows suit.

the UCL, FAL, CLRA and breach of express warranty claims but not as to the breach of implied warranty claim.

### 2. Damages

Plaintiff must present a damages model that is consistent with her liability case, and the court "must conduct a rigorous analysis to determine whether that is so." Comcast Corp., 133 S. Ct. at 1433 (internal quotation marks omitted). Plaintiff "must be able to show that [her] damages stemmed from the defendant's actions that created the legal liability." Leyva v. Medline Indus., Inc., 716 F.3d 510, 514 (9th Cir. 2013). "Calculations need not be exact." Comcast, 133 S. Ct. at 1433. Here, Plaintiff's liability case is based upon the alleged mislabeling on Ocean Spray "Cran-Apple" and "Cran-Grape" products which state "No . . . artificial flavors" when in fact they contain artificial flavoring chemicals that simulate the advertised fruit flavors. Plaintiff asserts that these misrepresentations led consumers to pay more than they otherwise would have.

Damages under the UCL[9], FAL[10], and the CLRA[11] provide for restitution. Colgan v. Leatherman Toll Grp., 135 Cal. App. 4th 663, 694 (2006). Restitution restores the status quo "by returning to the plaintiff funds in which he or she has an ownership interest." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1149 (2003). "The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." Werdebaugh, 2014 WL 2191901, at *22 (citing Colgan, 135 Cal. App. 4th at 700). "Restitution can . . . be determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices." Werdebaugh, 2014 WL 2191901, at *22. While a plaintiff must present the likely method for determining class damages, "it

---

[9] Cal. Bus. & Prof. Code § 17203.
[10] Cal. Bus. & Prof. Code § 17535.
[11] Cal. Civ. Code § 1780(a)(3).

17cv2335-GPC(MDD)

is not necessary to show that [this] method will work with certainty at this time." <u>Chavez v. Blue Sky Natural Beverage Co.</u>, 268 F.R.D. 365, 379 (N.D. Cal. 2010). <u>Comcast</u> demands that Plaintiff demonstrates, with evidence, that there is a class-wide method of determining damages that is consistent with her theory of liability. <u>See</u> <u>Comcast Corp.</u>, 133 S. Ct. at 1433.

Plaintiff presents two proposed Price Premium damages models that she claims are consistent with her theory of liability and satisfy <u>Comcast.</u> She claims that damages can be calculated on a class wide basis by showing the price premium or the premium amount that consumers are willing to pay for Ocean Spray's "No artificial flavors" labeling claims. Defendants oppose.

Plaintiff's first damages model is based on a consumer survey conducted by her expert, Dr. George E. Belch. Dr. Belch was retained to determine whether a "claim made on a package label that Ocean Spray Cranberry juice-based beverage products, such as Cran-Apple and Cran-Grap, contain no artificial flavors and the absence of a label declaration of artificial flavors, affect the price a reasonable consumer is willing to pay for them." (Dkt. No. 23-20, Belch Expert Report ¶ 6.) Towards this end, Dr. Belch conducted a consumer survey. In a supplemental declaration, Dr. Belch specifies that this consumer survey is based on contingent valuation methodology.[12] (Dkt. No. 75-1, Suppl. Belch Decl. ¶ 5.) He explains that contingent valuation is "a survey based method of estimating the value that a consumer places on an item by varying its features and having them directly report what they are willing to pay for it." (<u>Id.</u>) The methodology

---

[12] Because the parties did not sufficiently brief the issue of damages as to Dr. Belch's survey, the Court ordered supplemental briefing including specifying which theory Plaintiff relies on as it appeared that the conjoint theory applied based on Dr. Belch's report but no detailed analysis was conducted. (Dkt. No. 68.) Dr. Belch explains that conjoint analysis would also have been a method to assess price sensitivity and to assess the impact of the disclosure regarding use of artificial flavors but conjoint analysis is more appropriate when the information sought includes multiple independent variables on product price, perceived value or willingness to buy a product; however, in this case, when there is only one independent variable, contingent valuation is a more useful survey methodology. (Dkt. No. 75-1, Suppl. Belch Decl. ¶¶ 7, 8.)

17cv2335-GPC(MDD)

measures "what a reasonable consumer would have paid for the Ocean Spray Cranberry juice products if they were aware of the use of artificial flavors in them." (Id.)  The survey asks "respondents to consider a hypothetical scenario and they are then asked to consider new information to help them make a purchase decision."  (Id. ¶ 6.)

Dr. Belch's multi-part consumer survey focused on Defendants' misleading labels and derived a damages model determining how much the allegedly mislabeled Products would have been worth if they had been labeled correctly.  (Dkt. No. 23-20, Dr. Belch's Expert Report at ¶¶ 10-38.)  He administered four versions of an online survey with 100 participants each and limited the participants to those consumers who purchased "Ocean Spray Cranberry juice" in the past six months.  (Id. ¶ 14.)  The purpose of selecting those purchasers was to select price premium representative consumers who would pay for naturally-flavored Ocean Spray juice products compared to an artificially-flavored one. (Dkt. No. 35 at 12.)  Two of the surveys included bottles and package labels for Ocean Spray Cran-Apple juice and the other two for Ocean Spray Cran-Grape juice.  (Dkt. No. 23-20, Belch Expert Report ¶ 13.)  For each juice product, one label contained the banner, "No High Fructose Corn Syrup, Artificial Colors or Flavors", while the other "control" label was modified and labeled "Artificially Flavored" in the same banner location.  (Id.)  Initially, participants were asked to evaluate the design of the labels as to whether they were attractive, interesting, unique, colorful, appealing, and informative. (Id. ¶ 15.)  Then they were asked whether any images on the labels would be important when evaluating whether to purchase the product.  (Id.)  If they answered yes, then they were asked to respond to additional questions.  (Id.)  After questions relating to the importance of the different information contained on the labels, the survey asked about the price the respondents were willing to pay for the Cran-Apple and Cran-Grape juices with both sets of labels.  (Id. ¶ 17.)  The purpose of the question was to determine how consumers would respond if they knew the Cran-Apple and Cran-Grape juices were artificially flavored and how this would influence the price they might be willing to pay. (Id.)

17cv2335-GPC(MDD)

After analyzing the survey results, Dr. Belch concluded, "[c]onsumers who see Ocean Spray Cranberry juice product labels stating the product has no artificial flavors evaluate it more favorably on important product attributes such as nutritional value, healthiness, and having natural ingredients compared to those who see labels disclosing that the product is artificially flavored. Consumers also have higher levels of purchase likelihood for Ocean Spray Cranberry juice products that use the claim of no artificial flavors on the label versus those products that include a disclosure of artificial flavors on the package label." (Id. ¶ 35.) Based on the surveys, Dr. Belch determined that the price premium attributable to Ocean Spray's "No artificial flavors" labeling claim was 61 cents. (Id. ¶ 38.)

In opposition, Defendants challenge Dr. Belch's methodology and his Price Premium damages model. As to methodology, they argue that Dr. Belch assumed that fumaric and/or malic acids function as flavors without specifically asking the survey-takers whether they believed that malic or fumaric acids are artificial flavors. Defendants also challenge Dr. Belch's selection of survey takers to those who had purchased Ocean Spray "cranberry juice" in the past six months and claim the survey questions were skewed because the survey takers were responding to product questions that were distinct from the Products at issue. Lastly, Defendants contend that the survey only provided respondents with various renderings of Ocean Spray bottles depicting only the front display panel and not the back panel which includes legally required labeling standards.

Typically, "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." Wendt v. Host Int'l, Inc., 125 F.3d 806, 814 (9th Cir. 1997); see e.g., Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001) ("issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility"). While Defendants may have issues with Dr. Belch's methodology, on class certification, such challenges do not address whether Plaintiff's damages models comport with Comcast.

As to his damage model, Defendants argue that Dr. Belch has provided a demand-side analysis which fails to satisfy <u>Comcast</u>.  They challenge Dr. Belch's contingent valuation model as one that measures "hypothetical scenarios" and is unconnected to what Ocean Spray actually makes.  Plaintiff responds that the contingent valuation model is a reliable survey methodology to determine the price premium.

 District courts have held that contingent valuation analysis is a reliable survey based methodology to determine price premium damages.  <u>See</u> <u>Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prod. Liab. Litig.</u>, No. MDL 10-2172-CJC, 2012 WL 4904412, at *1 (C.D. Cal. Sept. 20, 2012) ("hedonic regression, contingent valuation, and discrete choice, are generally accepted, have been tested, and are part of peer-reviewed studies"); <u>Dzielak v. Whirlpool Corp.</u>, Civ. No. 12cv89 (KM)(JBC), 2017 WL 1034197, at *16-18 (D.N.J. Mar. 17, 2017) (<u>Daubert</u>[13] analysis); <u>Miller v. Fuhu Inc.</u>, No. 2:14cv6119-CAS-AS, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015) ("numerous courts, including this one, have accepted both [Choice-Based Conjoint Analysis] and [Contingent Valuation Method] as reliable methodologies for calculating price premiums on a class[-]wide basis in consumer class actions.").

However, what matters is not whether a methodology is admissible under <u>Daubert</u> but whether it is sufficiently linked to the theory of damages and is capable of identifying damages on a class-wide basis.  <u>Hadley v. Kellogg Sales Co.</u>, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018) (whether [the] proposed conjoint analysis is sufficiently reliable from a methodological standpoint—and therefore admissible under <u>Daubert</u>—is a different issue from whether the conjoint analysis satisfies <u>Comcast</u>") (citing <u>In re ConAgra Foods, Inc.</u>, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015).  As such, the critical question is whether Dr. Belch's methodology complies with <u>Comcast</u>.

---

[13] <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993).

On that question, Plaintiff contends that her damages model satisfies <u>Comcast</u> and can be calculated on a class wide basis. Dr. Goedde, Plaintiff's economic expert, was provided with Dr. Belch's expert report and Ocean Spray's wholesale unit sales information. (Dkt. No. 75-4, Suppl. Goedde Decl. ¶¶ 18, 22.) During discovery, Defendants disclosed the number of "wholesale unit sales" sold in California and the "wholesale $ sales" of their products sold to retailers from 2011-2017. (Dkt. No. 78-2, Suppl. Goedde Decl., Schedule 6 at 29 (UNDER SEAL).) Based on a $3.25 standard retail price for Defendant's Products and Ocean Spray's wholesale unit sales in California, Dr. Goedde was able to determine the estimated retail sales from 2011-2017. (Dkt. No. 75-4, Suppl. Goedde Decl. ¶ 22.) Based on this number, Dr. Goedde applied the price premium determined through Dr. Belch's survey results and calculated the amount of restitution. (<u>Id.</u> ¶ 23.)

Defendants object to Dr. Belch's survey arguing it addresses only the demand side of the transaction and not the supply side which courts have held to be inadequate under <u>Comcast</u>.[14] For example, Dr. Belch's survey does not address whether there are any products available for purchase at any price that closely resemble the proxy product in Belch's survey and does not have any information that retailers would be willing to sell the Ocean Spray products for some 19% less than they currently charge, or that the "no artificial flavors" claim is responsible for all or any portion of his so-called premium.

---

[14] In its supplemental brief, Defendants again argues that Dr. Belch's failure to specifically ask the survey takers about malic and fumaric acids, his survey results are irrelevant. As discussed above, this challenges the weight of Dr. Belch's methodology, not admissibility. Also, Defendants argue that Dr. Belch's study is flawed because he used a product with a label "artificially flavored" that is non-existent and therefore the conclusions are far removed from any underlying data and should be deemed inadmissible. (Dkt. No. 79 at 7-8.) However, hypothetical products are used in surveys involving contingent valuation methodology. <u>See</u> <u>Hadley</u>, 324 F. Supp. 3d at 1103 (survey takers were asked "to choose between hypothetical cereal or breakfast bar products that differ in brand, flavor, labeling statements, price, and, for the survey corresponding to Kellogg's Frosted Mini Wheats, biscuit size."). Defendants' arguments are not persuasive.

17cv2335-GPC(MDD)

District courts have held that demonstrating a consumer's willingness to pay is insufficient to satisfy <u>Comcast</u> as it fails to take into consideration any "corresponding gain by the defendant." <u>See</u> <u>Hadley</u>, 324 F. Supp. 3d at 1105 ("courts have repeatedly rejected conjoint analyses that only measure demand-side willingness-to-pay"). "The ultimate price of a product is a combination of market demand and market supply." <u>In re NJOY, Inc. Consumer Class Action Litig.</u>, 120 F. Supp. 3d 1050, 1119-20 (C.D. Cal. 2015) (rejecting expert's conjoint and direct method analyses because it "completely ignores the price for which NJOY is willing to sell its products, what other e-cigarette manufacturers say about their products, and the prices at which those entities are willing to sell their products.").

At the same time, courts have found that the supply side of the conjoint analysis damages model is satisfied if the prices in the surveys reflect the actual market prices during the class period and the quantities used reflect the actual quantities of products sold. <u>Hadley</u>, 324 F. Supp. 3d at 1105; <u>Brookfield v. Craft Brew Alliance, Inc.</u>, Case No. 17cv1027-BLF, 2018 WL 4952519, at *18-19 (N.D. Cal. Sept. 25, 2018); <u>In re MyFord Touch Consumer Litig.</u>, 291 F. Supp. 3d 936, 969-71 (N.D. Cal. 2018) (finding that the conjoint analysis adequately accounted for supply-side factors "by assuming that the supply—the quantity—was fixed"); <u>Davidson v. Apple, Inc.</u>, Case No. 16cv4942-LHK, 2018 WL 2325426, at *22 (N.D. Cal. May 8, 2018) (finding that a proposed conjoint analysis from the same expert adequately "account[ed] for the supply side of the equation" and because the supply remains constant as it is not affected by the failure to disclose or not).

In <u>Hadley</u>, the defendant packaged breakfast cereals and cereal bars as healthy but excess added sugar allegedly caused those products to be unhealthy. <u>Id.</u> In a conjoint analysis, "[s]urvey respondents are . . . asked to choose between different sets of product attributes, the responses are aggregated, and statistical methods are then used to determine the value (often termed "partworth") that consumers attach to each specific attribute." 324 F. Supp. 3d at 1105. The court recognized that district courts have

rejected conjoint analyses because the plaintiff failed to account for the supply side and only measured demand-side willingness to pay, but noted that courts have found conjoint analysis can account for supply-side factors "without running afoul of <u>Comcast</u>" when "(1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period." <u>Id.</u> at 1105. The court concluded that the expert's proposed conjoint analysis accounted for supply-side factors by utilizing prices that are observed in the market and relied on actual sales data or quantities of the challenged products actually sold during the class period which are constant. <u>Id.</u> at 1106.

In another recent case, <u>Schneider v. Chipotle Mexican Grill, Inc.</u>, --F.R.D.--, 2018 WL 4700353, at *15 (N.D. Cal. Sept. 29, 2018), the plaintiff brought suit against Chipotle for falsely and misleadingly advertising its food products as "non-GMO" when in fact the food products contained ingredients that came from animals that fed on genetically modified feed. <u>Id.</u> at *8. The plaintiff sought restitution which is the "difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices." <u>Id.</u> at *7. Plaintiff's expert used a survey to measure the impact of the "non-GMO claims and concluded that the supply-side factor was accounted for because the expert report based its price on "actual prices that Chipotle charged for their food items" which was sufficient to link the "measured willingness to pay to the real-world marketplace in which Chipotle's products are sold." <u>Id.</u> at *15. The court recognized that the expert report will be subject to many challenges on cross-examination but it was sufficient to satisfy <u>Comcast</u>. <u>Id.</u>

Here, Dr. Belch's survey methodology addresses only the consumers' willingness to pay and does not address the supply side factors. However, Plaintiff implicitly

17cv2335-GPC(MDD)

addresses the supply side factors through Dr. Goedde's supplemental declaration.[15]  Dr. Goedde relied on Dr. Belch's survey results and created a formula using a $3.25 standard retail price[16] and Ocean Spray's actual wholesale unit sales in California.  Because Plaintiff's expert relied on the actual unit sales of Ocean Spray products during the class period and a standard $3.25 retail price to reflect actual prices,[17] Defendants' argument that Plaintiff's demand-side model fails to account for real world market conditions and is based on hypotheticals is without merit.  See Hadley, 324 F. Supp. 3d at 1105; Brookfield, 2018 WL 4952519, at 19-20.  Because Plaintiff has demonstrated she is able to account for supply-side factors, the Court concludes that Plaintiff has demonstrated a damages framework to determine that the price premium paid for the "no . . . artificial flavors" labels is attributed to Defendants' alleged misrepresentations and predominance has been satisfied as required by Comcast on the UCL, FAL and CLRA claims.

Alternatively, in her motion, Plaintiff also retained Dr. Alan G. Goedde to conduct a survey of published juice prices from retailers in Southern California as a means to determine the price premium for Ocean Spray's "no artificial flavors" labels.  (Dkt. No.

---

[15] Defendants argue that the Court should disregard Dr. Goedde's supplemental declaration which was filed long after class certification motion briefing was concluded and Ocean Spray has not had the opportunity or address or respond to this new information.  In the Court's order directing supplemental briefing, the Court invited a supplemental declaration.  (Dkt. No. 68 at 3.)  Plaintiff presented the supplemental declaration to support her contingent valuation damages theory.  Defendants have had an opportunity to respond by filing its response to the supplemental brief.  (Dkt. No. 79.)  The Court declines to disregard Dr. Goedde's supplemental declaration.

[16] During discovery, Plaintiff sought retail pricing data compiled by Nielsen Company LLC ("Nielsen") to which Ocean Spray subscribes.  (Dkt. No. 34 at 4.)  On October 4, 2018, non-party Nielsen filed a motion for protective order.  (Dkt. No. 51)  On November 21, 2018, the Magistrate Judge granted Nielsen's motion for protective order.  (Dkt. No. 82.)  Although Plaintiff is barred from obtaining Nielsen's data, Plaintiff may be able to obtain average retail pricing data either "directly from retailers or from websites of retailers who sell the disputed Products."  (Dkt. No. 75-4, Dr. Goedde Suppl. Decl. ¶ 21.)

[17] Defendants do not dispute the $3.25 average retail price for their products and $3.25 may be an appropriate average retail price.  See Brookfield, 2018 WL 4952519, at 19 (concluding that price range comports with real world pricing data where expert report did not include prices that were charged by the defendant but reflect a "'realistic' price range for the product, which can and must include prices 'higher or lower than the prices of currently offered products.'").

17cv2335-GPC(MDD)

23-21, Goedde Expert Report ¶¶ 9-16.) He concluded that the average price for artificially flavored juices sold in 59 to 64 ounce packaging was $2.30 while the average price for natural juices in 59 to 64 fluid ounce packaging was $2.96 indicating a price premium of "$.66 or 29% over similarly sized artificially flavored products." (Id. ¶ 13.) Defendants argue that Dr. Goedde's proposed damages model is fatally flawed challenging his use of diverse comparative products, retailing concepts, juice percentages and an irrelevant specific time period, August 1-3, 2018, in his analysis. The Court agrees.

Dr. Goedde conducted an analysis which purported to determine price differences between naturally flavored and artificially flavored juices. (Id. ¶ 9.) He conducted a survey of published juice prices from Southern California retailers from August 1-3, 2018. (Id.) Product comparisons were made between similarly sized or packaged products. (Id. ¶ 12.) Based on the survey of published juice prices, Dr. Goedde concluded that there was a price premium of 25% for all natural juice products. (Id. ¶ 13.)

Dr. Goedde's methodology is similar to those rejected by a number of courts. For example, in In re Pom Wonderful, the district court decertified a class action based on damages where the plaintiff alleged that POM falsely advertised the various health benefits of its products. In re POM Wonderful LLC, No. ML-10-2199 DDP(RZx), 2014 WL 1225184, at *1 (C.D. Cal. Mar. 25, 2014). In that case, the plaintiff proposed a Price Premium Model for damages under the FAL, UCL and CLRA and quantified damages by comparing the price of POM with other refrigerated juices of the same size and assumed that absent the alleged misrepresentation, the market price for POM would have been lower. Id. at 3. The court noted that the damages expert did not conduct a survey or consider other evidence to determine what consumers' behavior might otherwise have been. Id. at 5. Instead, the expert merely used an average of refrigerated juice prices as a benchmark and made no attempt to show how POM's alleged misrepresentation caused any amount of damages. Id. The expert failed to explain why the price difference existed

and to what extent it was a result of POM's actions.  Id.  He simply calculated what the price difference was and assumed, without a methodology, that the price differential was attributable with POM's misrepresentations.  Id.  The court held the Price Premium Model proposed in the case did not satisfy Comcast.  Id.

Similarly, in Wedebaugh, the plaintiff's expert compared the price of the accused Products to the price of allegedly comparable products that did not have the "All Natural" and "evaporated Cane Juice" label statements and calculated the price difference as restitution of the alleged misrepresentation.  Wedebaugh, 2014 WL 2191901, at *23.  However, the damages model did not link the price difference to the allegedly unlawful or deceptive label statements.  Id.  Relying on In re Pom, the court concluded, "[r]ather than answer the critical question why that price difference exist[s], or to what extent it [is] the result of [the defendant's] actions, [the expert] instead assumed that 100% of that price difference [is] attributable to [Defendant's] alleged misrepresentations."  Id.  The Price Premium Model, as proposed by the plaintiff, was unable to account for any differences between the accused products and the expert's chosen comparable products, or for any factors that may cause consumers to prefer the accused products over other identical products.  Id.  Therefore, the Price Premium Model was insufficient under Comcast.  Id.

Just as in In re POM and Werdebaugh, Dr. Goedde's model fails to take into account Comcast's requirement that class-wide damages be connected to the legal theories and attributed to Defendants' alleged misrepresentations.  See In re POM Wonderful, 2014 WL 1225184, at *5; Werdebaugh, 2014 WL 2191901, at *23 ("Price Premium Model runs afoul of Comcast . . . [it] has no way of linking the price difference, if any, to the allegedly unlawful or deceptive label statements or controlling for other reasons why allegedly comparable products may have different prices.").  Accordingly, the Price Premium Model proposed by Dr. Goedde does not satisfy Comcast's requirements as a standalone damages model or comply with predominance requirements under Rule 23(b)(3).  See Comcast, 133 S. Ct. at 1430.  This ruling only applies to Dr.

Goedde's separate retail price model and does not affect his calculation of restitution damages based on Dr. Belch's survey results as explained in his supplemental declaration.

Lastly, Plaintiff has wholly failed to demonstrate how the Premium Price Model satisfies <u>Comcast</u> as to her breach of warranty claims. Accordingly, the Court concludes that predominance, as to damages, has been satisfied as to the UCL, FAL and CLRA claims but not the breach of express warranty or breach of implied warranty causes of action.

### 2. Superiority

"Rule 23(b)(3) requires that a class action be 'superior to other available methods for fairly and efficiently adjudicating the controversy,' and it specifically mandates that courts consider 'the likely difficulties in managing a class action.'" <u>Briseno v. ConAgra Foods, Inc.</u>, 844 F.3d 1121, 1128 (9th Cir. 2017). Superiority requires a consideration of "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(a)-(d).

The superiority requirement tests whether "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." <u>Valentino v. Carter-Wallace, Inc.</u>, 97 F.3d 1227, 1234 (9th Cir. 1996). "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually a class action is not superior." <u>Zinser v. Accufix Research Inst., Inc.</u>, 253 F.3d 1180, 1192 (9th Cir. 2001). Superiority is met where the case involves multiple claims for relatively small individual sums and where some or all of the plaintiffs may not be able to proceed as individuals because of the disparity between their litigation costs and what they hope to recover. <u>Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.</u>, 244 F.3d 1152, 1163 (9th Cir. 2001). "Class actions . . . may permit the plaintiffs to

pool claims which would be uneconomical to litigate individually." Id. (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985)).

Here, Defendants do not dispute that a class action is superior to other available methods for the fair and efficient adjudication of this issue. In this case, because the misrepresentation claims are common to the class, involve small sums of money, $0.61 cent premium, and do not rely on individual determinations, a class action is the superior method of efficiently and fairly adjudicating Plaintiff and the class members' claims in this case. Therefore, the Court finds the superiority requirement of Rule 23(b)(3) met as to the UCL, FAL, CLRA and breach of express warranty claims.

Based on the foregoing, the Court GRANTS Plaintiff's motion for class certification pursuant to Rule 23(b)(3) on the UCL, FAL and CLRA claims.[18]

## D. Federal Rule of Civil Procedure 23(b)(2)

Plaintiff also seeks certification for an injunctive relief class under Rule 23(b)(2). Defendants' sole argument against certifying a class under Rule 23(b)(2) is that Plaintiff lacks standing to pursue a claim for injunctive relief because she testified she has no desire to purchase products containing either malic or fumaric acid from Ocean Spray or otherwise, no matter what the label says.

Rule 23(b)(2) permits class treatment when "the party opposing the class has acted or refuses to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.

---

[18] In the motion for class certification, Plaintiff asserts that the class is ascertainable. However, the Ninth Circuit has declined to adopt an ascertainability and/or administrative feasibility requirement for class plaintiffs to demonstrate for purposes of class certification explaining that "Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification." Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1126, 1133 (9th Cir. 2017) (joining Sixth, Seventh, and Eighth Circuits and declining to impose an additional hurdle beyond those delineated in Rule 23). The court explained that policy concerns concerning administratively feasibility are already addressed by Rule 23. Id. at 1133; see Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1136-39 (9th Cir. 2016) (addressing an overbroad class definition as part of predominance issue). Accordingly, the Court does not address ascertainability.

17cv2335-GPC(MDD)

R. Civ. P. 23(b)(2).  In a recent case, the Ninth Circuit resolved a district court split and held that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm."  Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 969 (9th Cir. 2018).  In providing some context to this holding, the Court explained, "[i]n some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to."  Id. at 969-70 (citations omitted).  "In other cases, the threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved."  Id. at 970 (citation omitted).

In Davidson, the plaintiff paid a premium for wipes labeled "flushable" as opposed to "non-flushable" wipes and alleged that she continues to desire to purchase wipes that are flushable in a household toilet, would purchase truly flushable wipes if they were manufactured by the defendant, regularly visits stores where the defendant's flushable wipes are sold and is continually presented with the defendant's flushable wipes packaging but does not know if the representations are true.  Id. at 970-71.

The court explained that the plaintiff alleged an injury that is "concrete and particularized" because she claimed she is unable to rely on the validity of the defendant's advertisement despite her desire to purchase truly flushable wipes.  Id. at 971.  She also demonstrated that she will likely be wronged in a similar way because should she encounter the "flushable" wipes at the stores, she could not rely on the representation.  Id.  Lastly, an injunction would redress her injury by requiring the defendant to make truthful representations on its wipe products.  Id. at 972.  The court held that the plaintiff established Article III standing to allege a claim for injunctive relief

because "she has no way of determining whether the representation 'flushable' is in fact true when she regularly visits stores . . . where Defendants' 'flushable' wipes are sold [and] constitutes a threatened injury [that is] certainly impending." Id. at 972 (internal quotations omitted).

In this case, when Plaintiff was asked "[a]s long as Ocean Spray CranApple contains malic acid as an ingredient, would you ever buy it again", (Dkt. No. 30-3, Shackleford Decl., Ex. 1, Hilsley Depo. at 119:4-6), she responded, "Maybe, maybe not. I don't know. If they could certify that it was natural and wasn't artificial." (Id. at 119:9-12.) Then she was asked, "The Ocean Spray CranGrape, as long as it contains fumaric acid, would you ever buy that product again?" (Id. at 119:13-15.) She responded, "The answer is no, as long as they contain anything that's artificial, I wouldn't purchase it." (Id. at 18-20.) "And that's regardless of what the label says; is that true?" (Id. at 119:22-23.) "Correct." (Id. at 119:24.) In a declaration, she states she would and intends to purchase the Ocean Spray Products again in the future if the labels were accurate and they actually contained "No artificial flavors or preservatives." (Dkt. No. 23-19, Hilsley, Decl. ¶ 7.) The Complaint also allege that she "intends to, desire to, and will purchase the Products again when she can do so with the assurance that Products' labels, which indicate that the Products are solely naturally-flavored, are lawful and consistent with the Products' ingredients." (Dkt. No. 1-2, Compl. ¶ 90.) Her assertions show that she intends to purchase the Ocean Spray Products again in the future if the labels were accurate. However, she is unable to "rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." Davidson, 889 F.3d at 969-70.

Defendants misconstrue Plaintiff's deposition testimony; she did not testify that she would never buy an Ocean Spray Product again, with or without malic or fumaric acid, instead she stated that she would not buy the Products again if they contained artificial flavors but she would buy them if they were accurate. Here, Plaintiff has standing to seek injunctive relief under Rule 23(b)(2).

Defendants do not challenge whether Plaintiff is entitled to class certification under Rule 23(b)(2). Rule 23(b)(2) permits class treatment when "the party opposing the class has acted or refuses to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction . . . would provide relief to each member of the class." Dukes, 564 U.S. at 360. The "key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted-the notion that the conduct is such that it can be enjoined . . . only as to all of the class members or as to none of them.'" Id. (citation omitted). Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a *different* injunction . . . against the defendant," or "to an individualized award of monetary damages." Id. at 360-61 (emphasis in original).

Here, Plaintiff asserts that all Products contain the "no artificial flavors" labels, all class members were exposed to the same or substantially similar misleading labels and a single final injunctive relief would provide relief to each member of the class. Therefore, the Court concludes that certification under Rule 23(b)(2) is appropriate.

## Conclusion

The Court GRANTS in part and DENIES in part Plaintiff's motion for class certification under Rule 23(b)(3).[19] The Court GRANTS Plaintiff's motion to certify a class as to the UCL, FAL, and CLRA causes of action but DENIES the motion to certify a class as to the breach of express and implied warranty claims under Rule 23(b)(3). Also, the Court GRANTS Plaintiff's motion for class certification under Rule 23(b)(2).

The Court certifies a Class consisting of:

---

[19] In the conclusion of their opposition, Defendants assert "Arnold Worldwide had nothing whatsoever to do with malic or fumaric acid and not class can be certified against it." (Dkt. No. 30 at 30.) Defendants' summary assertion in their conclusion paragraph does not suffice to deny class certification as to Defendant Arnold Worldwide. Accordingly, the Court rejects Defendants' summary argument.

17cv2335-GPC(MDD)

All California Citizens who purchased one of the following Ocean Spray Products, for personal and household use and not for resale, in California from January 1, 2011 until the date class notice is disseminated:

• Ocean Spray Cran Apple;
• Ocean Spray Cran Grape;
• Ocean Spray "100% Apple" Juice Drink;
• Ocean Spray Cran Rasberry;
• Ocean Spray Wave Apple with White Cranberries;
• Ocean Spray Wave Berry Medley;
• Ocean Spray Cran Cherry;
• Ocean Spray Cran Pineapple;
• Ocean Spray Cran Pomegranate;
• Ocean Spray Diet Cran Pomegranate;
• Ocean Spray Diet Cran Cherry;
• Ocean Spray Cranberry Cherry Flavor 100% Juice.

Excluded from the Class are Defendants' current and former officers and directors, members of the immediate families of Defendants' officers and directors, Defendants' legal representatives, heirs, successors, and assigns, any entity in which Defendants have or had a controlling interest during the Class Period, and the judicial officers to whom this lawsuit is assigned.

Because the Court GRANTS class certification, the Court appoints Plaintiff Crystal Hilsley as the Class Representative.

Plaintiffs also seeks to have the Law Offices of Ronald A. Marron and the Law Office of David Elliot appointed as Class Counsel. When appointing class counsel the Court considers "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). "A court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). Based on Plaintiff's counsel extensive experience in class action litigation involving consumer class actions including false advertising, as well as

mislabeling of consumer products, (Dkt. No. 23-2, Marron Decl.; Dkt. No. 23-18, Elliot Decl.), and their performance in prosecution this case, the Court appoints Law Offices of Ronald A. Marron and the Law Office of David Elliot as Class Counsel.

Plaintiff also seeks approval of Notice to the Class under Rule 23(c)(2)(B) which is submitted by Plaintiff. (Dkt. No. 23-16, Marron Decl., Ex. 13.) Because of the changes made to the Class Definition discussed above, the Court DIRECTS the parties to meet and confer regarding the proposed method and form of class notice. Any agreed-upon notice shall be presented to the Court for approval no later than **December 14, 2018**. In the event the Parties cannot agree upon the form of the notice, each side shall file its proposal on **December 21, 2018**.

IT IS SO ORDERED.

Dated: November 29, 2018

Hon. Gonzalo P. Curiel
United States District Judge

17cv2335-GPC(MDD)