**EXHIBIT 8**

GREENBERG TRAURIG, LLP
Rick L. Shackelford (SBN 151262)
Adam Siegler (SBN 116233)
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone: 310-586-7700; Fax: 310-586-7800
*Email:   ShackelfordR@gtlaw.com*
          *SieglerA@gtlaw.com*

Attorneys for Defendants
Ocean Spray Cranberries, Inc. and Arnold Worldwide, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL HILSLEY, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> OCEAN SPRAY CRANBERRIES, INC.; ARNOLD WORLDWIDE LLC, and Doe Defendants 1 through 5, inclusive, <br><br> Defendant. | CASE NO.:  3:17-CV-2335-GPC-MDD <br><br> [Hon. Gonzalo P. Curiel] <br><br> **DEFENDANT OCEAN SPRAY CRANBERRIES, INC.'S EXPERT DECLARATION OF NICOLE LISKA** <br><br> Date of Removal:        September 19, 2017 |

DECLARATION OF NICOLE LISKA
**EXHIBIT 8 - PAGE 064**

## DECLARATION OF NICOLE LISKA

I, Nicole Liska, declare as follows:

1.     I am familiar with and have personal knowledge of the matters set forth in this declaration and if called upon to do so, could and would testify competently thereto, except where my knowledge is based upon information and belief, and as to those matters, I understand and believe them to be true.

**QUALIFICATIONS**

2.     I am a principal of Fulcrum Financial Inquiry LLP ("Fulcrum").  Fulcrum's business consists primarily of performing damages analyses in litigation, business appraisals and forensic accountings.  I work with a broad range of firms and industries in order to analyze and explain complex economic and financial matters.  I have provided testimony in Federal Court and in depositions.

3.     I have a Masters Degree in Economics from the University of California, San Diego and have completed coursework and written qualifying exams towards Ph.D candidacy (aka "ABD") from the University of California, San Diego.  I have obtained an undergraduate degree in economics (summa cum laude) from Hartwick College.

4.     Attached as Exhibit A is a copy of my curriculum vitae summarizing my education, experience, and qualifications.  My expertise and work experience are pertinent for the comments contained in this declaration.

5.     Fulcrum is being paid at its normal hourly rates for the persons involved in the assignment.  Our compensation is not contingent on the conclusions reached or ultimate resolution of the case.  My personal hourly rate is currently $450.

**RELEVANT BACKGROUND & FULCRUM'S ASSIGNMENT**

6.     The following is relevant background in preparing this declaration:

DECLARATION OF NICOLE LISKA

**EXHIBIT 8 - PAGE 065**

(i)   The Complaint alleges:

   a.  Defendants (Ocean Spray Cranberries ("Ocean Spray") and Arnold Worldwide LLC), have falsely and deceptively labeled and marketed various Ocean Spray juice products (including "Cran-Apple" and "Cran-Grape", collectively the "Products") as premium products because, *inter alia*, they do not contain artificial flavors.

   b.  The false and deceptive labelling/marketing has wrongly allowed the Products to be sold for a higher retail price than its competitors' products that correctly label its products as containing artificial flavors.  Had Plaintiff and the Class been aware that the Products contained artificial flavors, they would not have purchased the product or would have paid less for it.

(ii)  The Order Granting in Part and Denying in Part Plaintiff's Motion for Class Certification and Appointing Class Counsel, dated November 29, 2018, ruled:

"…*the Price Premium Model proposed by Dr. Goedde does not satisfy* <u>Comcast's</u> *requirements as a standalone damages model or comply with predominance requirements under Rule 23(b)(3)…This ruling only applies to Dr. Goedde's separate retail price model and does not affect his calculation of restitution damages based on Dr. Belch's survey results as explained in his supplemental declaration.*"[1]

The Court references prior cases in support of its ruling in which it quotes:

"*Price Premium Model runs afoul of* <u>Comcast</u>*… [it] has no way of linking the price difference, if any, to the allegedly unlawful or deceptive label statements or controlling for other reasons why allegedly comparable products may have different prices.*"[2]

7.    I have been engaged to review and respond to the methodology and underlying information used by Plaintiff in determining a price premium associated with the allegations.  In

---

[1] Order Granting in Part and Denying in Part Plaintiff's Motion for Class Certification and Appointing Class Counsel, dated November 29, 2018, page 32

[2] Order Granting in Part and Denying in Part Plaintiff's Motion for Class Certification and Appointing Class Counsel, dated November 29, 2018, page 32

support of Plaintiff's motion for class certification, Dr. Alan Goedde issued (i) a declaration dated August 9, 2018, and (ii) a supplemental declaration dated October 25, 2018.  Based on the Court ruling, I have ignored the price premium analyses performed by Dr. Goedde as contained both in his initial declaration and his supplemental declaration.  Instead, I have considered Dr. Goedde's calculations that rely on Dr. Belch's survey results as put forth in Dr. Goedde's supplemental declaration.   I understand that Dr. Belch has not yet been deposed in this matter (re:  his declaration dated October 12, 2018, and supplemental declaration dated November 9, 2018).   I reserve the right to amend or supplement this declaration (i) once Dr. Belch's testimony has occurred, and (ii) if/when Dr. Goedde offers any additional price premium analyses.

**SUMMARY OF CONCLUSIONS**

8.      Plaintiff fails to use real world price data/information needed to determine a price premium.  This results in a hypothetical price premium that has no demonstrable relationship to real world conditions.  Lack of reliable real world data/information renders Plaintiff's price premium calculation purely speculative.

**DESCRIPTION OF DATA AVAILABLE TO CALCULATE PRICE PREMIUM**

9.      Nielsen collects, *inter alia*, point-of-sale data.  The data may be obtained from Nielsen for a fee and typically under a license agreement.  One of the methods that Nielsen uses to collect data is obtaining the data that is initially collected by scanners at various retailers.  Nielsen analyzes and verifies, *inter alia*, product price and volume and then licenses to its customers rights to its aggregated data and analytical services.   Manufacturers and retailers use point-of-sale data to assist in business decisions.  The following is provided on Nielsen's website:

> *Nielsen is a global leader in retail measurement services. Our purchasing data offers comprehensive and timely information on market shares, competitive sales volumes and insights into distribution, pricing, merchandising and promotion. By combining this detailed information with and professional consultative services, we offer valuable insights and expertise that help consumer packaged goods*

---

DECLARATION OF NICOLE LISKA

**EXHIBIT 8 - PAGE 067**

*(CPG) brands and retailers improve their manufacturing, marketing and sales decisions.*

*With presence in more than 100 countries, Nielsen collects sales information from more than 900,000 stores within our worldwide retail network—including grocery, drug, convenience, discount and e-commerce retailers—who, through cooperation arrangements, share their sales data with us.*

*Nielsen collects electronic point of sale (POS) data from stores through checkout scanners. In emerging markets where POS information is unavailable, we use field auditors to collect sales data through in-store inventory and price checks. Nielsen's stringent quality control systems validate the data before it's made available in our proprietary software…*[3]

10.   I understand that Ocean Spray has a license from Nielsen to access certain data, but its license agreement prohibits using such data in litigation.  According to the Court, Plaintiff is barred from obtaining this data through Ocean Spray (via a Nielsen Protective Order).[4] However, Plaintiff can purchase sales data directly from Nielsen, but apparently has not done so. Dr. Goedde offers alternate means to collect retail sales data, but has not apparently pursued them.  According to Dr. Goedde:

*"…If Defendants do not have retail pricing data, additional information regarding average retail prices during the class period may be obtained directly from retailers or from websites of retailers who sell the disputed Products… Class-wide damages can be calculated once unit sales and average retail price data is produced by Defendants or obtained directly from retailers."*[5]

Data obtained directly from retailers and/or websites of retailers has significant limitations.  The following are examples and not meant to be exhaustive list of the limitations:

a.   I have not seen nor I am aware of any evidence that any retailer, much less all retailers, maintain (and would make available to Plaintiff) historical retail sales data encompassing the entire class period.  Accordingly, obtaining actual retail

---

[3] https://www.nielsen.com/us/en/solutions/measurement/retail-measurement.html

[4] Order Granting in Part and Denying in Part Plaintiff's Motion for Class Certification and Appointing Class Counsel, dated November 29, 2018, page 30, footnote 16

[5] Supplemental Declaration of Dr. Alan Goedde, dated November 9, 2018, ¶21

sales data from retailers is not likely realistic.  Apparently, Plaintiff (nor her experts) have undertaken this effort.

b.  Not all retail outlets sell the Products online and/or post prices online. Additionally, using online posted prices by any individual retailer fails to account for the percentage of retail sales made online (versus in-store).  This percentage will vary over time by every retailer statewide.  These realities make Dr. Goedde's review of online pricing inadequate to determine an average retail price.

c.  Posted online prices do not necessarily correlate to prices paid in-store due to coupons, in-store promotions, etc.  Accordingly, they are not necessarily the price actually paid.

d.  Even if the Products are sold online at some retail outlets, these outlets do not specify all of its current and historical sale prices and sale volumes.

11.  Actual retail sales data reflects actual consumer/purchaser behavior.  It measures not what people think they would purchase (or what price they hypothetically might pay), but rather what they actually purchased at a particular moment in a particular store under a particular set of market and competitive conditions.  Point of sale data can be used for, *inter alia*, price comparisons across juice brands/labels.

**DR. GOEDDE'S  OPINION**

12.  Dr. Goedde fails to consider actual sales data in calculating a price premium.  As discussed above, retail sales data reflects actual consumer/purchaser behavior and would allow one to determine any price premium.   Instead, Dr. Goedde relies exclusively on (i) Dr. Belch's survey results (which does not use actual sales data), and (ii) Ocean Spray's wholesale unit sales (not actual retail sales) to calculate damages.  Dr. Goedde's methodology is inherently flawed and/or incomplete; thus, it is unreliable.  The following are examples and not meant to be exhaustive list of Dr. Goedde's flawed methodology and conclusion.

a.  Dr. Goedde recklessly relies on Dr. Belch's stated $3.25 price to calculate damages without knowledge about what the $3.25 represents or how is was obtained.  Dr. Goedde applies this $3.25 price to Ocean Spray's wholesale unit sales in California to estimate retail sales from 2011 through 2017.[6]  The following is an excerpt from Dr. Goedde's testimony:

> Q:  "…you used an average selling price pf $3.25 in your supplemental report, is that right?
> A:  Yes
>
> Q:  Can you tell me how you arrived at that?
> A:  I relied on Dr. Belch.
>
> Q:  Do you know what Dr. Belch did to come up with that price?
> A:  No.
>
> Q:  Do you know what he meant by "average price"?
> A:  No.
>
> Q:  Do you know any work he did to calculate that price, whether it's a weighted average, anything else?
> A:  No. I relied on the conclusions he had in his report.
>
> Q:  If it turned out that the average price of the products was something different than $3.25, that would obviously affect your report, right?
> A:  Yes, that was an assumption I made in my report relying on Dr. Belch's analysis.
>
> Q:  If it turned out to be it was $4.25, that would drive up your damages number, right?
> A:  I don't know how it would affect it exactly.  I was looking – my analysis is based on, you know, that average price plus the difference that, you know, that was between artificially and non-artificially flavored. I mean, it could affect the price.  It would affect the damages however.
>
> Q:  And if it turned out that the average retail selling price was less than $3.25, that would reduce your aggregate damages number, true?
> A: Yes, yes.
>
> Have you ever spoken with Dr. Belch?
> A:  No. [7]

---

[6] Supplemental Declaration of Dr. Alan Goedde, dated November 9, 2018, ¶22

[7] Deposition of Dr. Alan Goedde, dated February 7, 2019, pages 13 – 15

DECLARATION OF NICOLE LISKA

**EXHIBIT 8 -** [6]**PAGE 070**

The estimated retail sales Dr. Goedde calculates is unreliable with no knowledge/understanding of the basis of the $3.25 price.

b. Dr. Goedde had no knowledge of the different package configurations (multi-packs, single serve 15.2 oz, etc.) that are critical in arriving at a proper calculation.  The following is an excerpt from Dr. Goedde's testimony:

> Q: "…what package configuration does Dr. Belch's $3.25 assumed retail price apply to?
> A:  I don't know.
>
> Q:  Is that important as all in your calculation of damages in this case?
> A:  What was important to me was to use that average price conclusion that Dr. Belch had and that's what I used.  I just relied on his report for that information.
>
> Q:  Okay.  And so I think we've covered this, and if I beat a dead horse please forgive me, but as part of both of your reports, you didn't look at anything to determine actual retail prices for Ocean Spray products at issue?
> A:  Correct, I didn't.  I'm not familiar with what Dr. Belch did.[8]

Without understanding the basis for the $3.25, one cannot appropriately and/or accurately apply it to wholesale unit sales that consists of two sizes (64-ounce and 60-ounce) over a seven-year period, which is what Dr. Goedde has done.  Dr. Goedde offered no opinion of damages relating to any other package configuration.

c. According to Dr. Belch's declaration, the $3.25 is a "referenced price" provided to the survey respondents.  This "referenced price" is a purported average selling price of any brand 64-ounce cranberry juice.  It is NOT the average actual price of the Products or even necessarily including any of the Products.  Rather, it appears to be some hypothetical price used merely as a point of reference to allow survey

---

[8] Deposition of Dr. Alan Goedde, dated February 7, 2019, page 17

DECLARATION OF NICOLE LISKA

**EXHIBIT 8 - PAGE 071**

7

respondents to indicate their willingness to pay a different price for the Products.

The following is an excerpt from Dr. Belch's declaration:

> "*The next section of the survey focused on the price respondents are willing to pay for Ocean Spray Cran-Apple/Cran-Grape juice.  Respondents were provided reference price information as follows: 'A 64 oz (1.89L) bottle of cranberry juice sells for an average price of $3.25 in a grocery store or online.'  They were then asked to indicate how much they would be willing to pay for a 64 oz. bottle of Ocean Spray Cran-Apple/Cran-Grape juice and were given 10-cent price increments both below and above the $3.25 average price...*"[9]

Dr. Goedde's reckless use of a hypothetical "referenced price" that is not the price of the Products at issue is inappropriate and fatally flawed.

    d.  Dr. Goedde's fails to follow his own description of how to calculate damages.  In paragraph 21 of his supplemental report, Dr. Goedde describes the calculation as follows:

> "*The out-of-pocket premium paid is calculated by multiplying the total amount paid by proposed class members for the disputed Products by the 20% price difference between the disputed Products' average price and the artificially flavored product price class members should have paid...The total out-of-pocket purchase price can be calculated by multiplying the number of units Defendants sold by average retail prices during the class period.  The number of units sold by Defendants in California and average retail pricing data is sales data that is maintained by manufacturers in the ordinary course of business.  If Defendants do not have retail pricing data, additional information regarding average retail prices during the class period may be obtained directly from retailers or from websites of retailers who sell the disputed Products.  I understand that Plaintiffs are currently seeking production of this data.  Class-wide damages can be calculated once unit sales and average retail price data is produced by Defendants or obtained directly from retailers.*[10]

Rather than apply his methodology, Dr. Goedde instead used (i) Dr. Belch's $3.25 "referenced price" that Dr. Goedde testified he does not know the basis for

---

[9] Declaration of Dr. George Belch, dated October 12, 2018, ¶17

[10] Supplemental Declaration of Dr. Alan Goedde, dated November 9, 2018, ¶21

---

DECLARATION OF NICOLE LISKA

**EXHIBIT 8 – PAGE 072**

purposes of his calculation[11], and (ii) Defendant's wholesale (not retail) unit sales. Dr. Goedde has not submitted any additional work/analyses that actually follow his described methodology.

e. Even if one were to accept the $3.25 "referenced price" price as appropriate for the Products of 64-ounce size, Dr. Goedde fails to consider other size bottles/packaging and corresponding sales as well as alternative channels of distribution pricing (e.g. large discount stores such as Walmart, and large drug stores).   As discussed above, Dr. Belch's hypothetical "referenced price" refers to a 64-ounce size cranberry juice.   Dr. Belch's survey ignores all other bottle sizes and package configurations.   The following provides examples of the different packaging and different channels of distribution for the Products (it is not an exhaustive list):

    i.   Individual sizes sold at retail include:  10-ounce, 25-ounce, 32-ounce, 46-ounce, 60-ounce, 64-ounce, 3-liter, 1-gallon, 96-ounce.

    ii.   Other package size configurations sold at retail include: 18 pack of 10-ounce, 48 pack of 5.5-ounce, 24 pack of 10-ounce

    iii.   Channels of distribution include:  grocery stores, MASS merchandisers (e.g., Target, Walmart), drug stores, Club stores, Convenience & Gas stores, e-commerce (e.g., Amazon)

Each packaging size will have a different price.  The average price will change depending on the number of units sold at each price, which, in turn, will vary by factors such as by retailer, by channel of trade, by location, by promotional support, etc.

---

[11] Deposition of Dr. Alan Goedde, dated February 7, 2019, pages 13 – 15, 17

---

DECLARATION OF NICOLE LISKA

**EXHIBIT 8 – PAGE 073**

9

f.  Similar to his lack of knowledge of the $3.25 price, Dr. Goedde lacks knowledge about the data to which he applies the $3.25 price (i.e., wholesale unit sales data).   Based on his testimony, Dr. Goedde does not know the following:

    i.  Average per unit wholesale price and the retailer's (e.g., Walmart, Ralphs, Vons) markup on the Products.[12]

    ii.  Whether or not all of the wholesale units were actually sold at retail in California (the relevant state for the Class) versus another state during the relevant time period (2011 – 2017).[13]

According to Dr. Goedde, he applies "*a $3.25 standard retail price to Defendants wholesale unit sales in the state of California yield*[ing] *estimated retail sales from 2011 – 2017 of $147,838,452.*"[14]  However, the above information, *inter alia*, should be known to make appropriate adjustments to his current flawed application.  In short, Dr. Goedde has attempted to solve a multiplication problem, but has no reliable real world information for either factor.  One unknown factor multiplied by another unknown factor cannot produce a product that has any demonstrable relationship to real world conditions.  Dr. Goedde's lack of reliable information renders his damages opinion purely speculative.

13.  I declare to the best of my information and belief, based on my training, experience and the materials upon which I relied, that the foregoing is true and correct.

Executed on April 3, 2019 at Los Angeles, California.



Nicole Liska

---

[12] Deposition of Dr. Alan Goedde, dated February 7, 2019, page 31

[13] Deposition of Dr. Alan Goedde, dated February 7, 2019, page 28

[14] Supplemental Declaration of Dr. Alan Goedde, dated November 9, 2018, ¶22

# EXHIBIT A

**EXHIBIT 8 - PAGE 075**



Fulcrum Financial Inquiry LLP
707 Wilshire Blvd., Ste. 2050
Los Angeles, CA 90017

(213) 787-4100
www.fulcrum.com

## Nicole A. Liska
213-787-4103
nliska@fulcrum.com

### SUMMARY

Ms. Liska specializes in applied economic and statistical modeling. She has experience with a diversity of cases including: personal injury & wrongful death, labor & employment, class action, statistical sampling, intellectual property, breach of contract, antitrust cases involving price discrimination, monopolization and price fixing, and accounting malpractice and securities cases involving company, asset and security valuation.  She has provided economic and financial analyses on these matters by combining sophisticated economic and statistical techniques.   Ms. Liska has provided testimony in Federal Court and in depositions.

### EDUCATION

ABD Department of Economics, University of California, San Diego (Coursework and written
    qualifying exams towards Ph.D. candidacy completed.)
M.A. Department of Economics, University of California, San Diego
B.A. Economics, summa cum laude, Hartwick College, Oneonta, New York

### EMPLOYMENT

Fulcrum Financial Inquiry, LLP, Principal, December 2010 – present.
Fulcrum Financial Inquiry, LLP, Manager, May 2004 – December 2010.
Econ One Research, Inc., Economist, December 2001 – May 2003.
Analysis Group/Economics Inc., Associate, June 2000 – November 2001.
University of California, San Diego, Teaching Assistant, Economics Department 1996 – 1999.
Hartwick College, Oneonta, New York, Research Assistant, Economics Department 1991-1994.
Fact Finders (Public Policy Research Firm), Data Collector/Analyst, Summers 1988-1993.

### CLIENT EXPERIENCE

Representative matters, arranged by legal area, include:

**Personal Injury/Wrongful Death**

- In a high profile matter, calculated past and future lost earnings associated with a popular rock singer and reality television star's severe injuries allegedly resulting from being hit on the head with stage equipment before performing a concert.  Lost earnings calculation involved (i) identifying and determining concerts the rock singer would have performed, (ii) identifying and determining reality television shows the star would have performed,

Nicole A. Liska – Page 1

**EXHIBIT 8 - PAGE 076**

and (iii) identifying and determining saved costs that were not incurred to appropriately deduct from lost earnings.

- On several occasions, calculated the past and future economic damages suffered allegedly resulting from residual mold.

- Determined lost earnings and benefits the plaintiff suffered (and may suffer in the future) from the alleged medical negligence of an eye surgeon.

- Calculated economic damages on multiple occasions related to claimed injuries from a series of products produced by a pharmaceutical and medical products company.

- On multiple occasions, calculated the present value of life care plans after determining (i) future medical care cost growth rates, (ii) life expectancies and associated probabilities of survival in each year of life expectancy, and (iii) appropriate discount rates.

- In a wrongful death lawsuit, calculated lost earnings and benefits associated with a prisoner that committed suicide while in prison.

- Researched and incorporated employment statistics from sources such as government data, industry organizations, and customized survey research on numerous occasions when past earnings were either (i) unavailable (usually due to youth), or (ii) not representative of the earnings potential.

**Labor, Employment and related Class Action**

- On many occasions, calculated employment related economic damages.  Examples of the underlying allegations include the following causes of action:

  - Wrongful termination

  - Race, gender, and age discrimination

  - Sexual Harassment

- In many alleged wrongful termination matters, calculated

  - lost compensation involving high net worth Plaintiffs that have relatively complex pay structures (including deferred compensation (e.g., stock options, equity, restricted stock))

  - lost retirement/pensions (defined benefit plans and contribution plans)

  - lost benefits (e.g., medical, dental, life insurance)

- In an alleged discrimination case, past and future lost earnings and benefits suffered by plaintiff were calculated. To assist in establishing liability, assessed the likelihood that discrimination occurred using statistics related to the Fisher Exact test and the Chi-square test.

- On numerous occasions, in wage/hour class action lawsuits, calculated economic damages associated with companies' alleged failures to:

  - pay overtime

Nicole A. Liska – Page 2

**EXHIBIT 8 – PAGE 077**

- pay timely
- pay wages upon ending employment
- provide meal and rest breaks
- maintain accurate payroll records,

Calculated appropriate sample size, accumulated data, created comprehensive database, and analyzed computerized payroll and human resource information to calculate damages associated with alleged labor code violations.

**Surveys, Statistical Sampling, and Class Action**

- To determine if a company was overbilling Medicare, designed a random sample of billings. Based on the sample results, estimated the total amount of billing overcharges based on proper statistical sampling methods.

- To determine the effects of one of the world's largest bookseller opening a retail store on nearby condominium residents, designed and implemented a survey instrument. Based on the survey results, assessed the likelihood that the store's presence had influence on the condominium owner's decision to purchase the condominium.

- In an audit of federal wildfire suppression costs, designed and implemented a statistically valid sample of the fire suppression costs. Estimated the total amount of billing overcharges based on proper statistical sampling methods.

- For a project analyzing data of billing overcharges of an insurance company, a random sample was designed and implemented.  Estimated the total amount of billing overcharges based on proper statistical sampling methods.

- In a false advertising and labelling class action matter in the hard liquor market (distilled spirits), determined if a price premium existed associated with the claim the alleged deceptive labelling had wrongly allowed the product at issue to be sold for a higher retail price than its competitors' products.  Calculated a price premium using point-of-sale data (data that is initially collected by scanners at various retailers).

**Intellectual Property**

- In an alleged trademark and copyright infringement case of one of the nation's top credit bureaus, (i) assessed the relevant market, (ii) quantified the trademark's effect on competitors, and (iii) calculated lost profits and disgorgement.

- On multiple separate alleged trademark infringement matters, assessed the candle and home fragrance market and calculated lost profits and unjust enrichment.

- In an alleged trademark infringement matter, assessed the likeliness of customer confusion by the illegal use of a U.S. based bank's logo by an established Korean bank. Calculated unjust enrichment and assessed damages associated with corrective advertising.

Nicole A. Liska – Page 3

**EXHIBIT 8 - PAGE 078**

- In an alleged patent infringement of a uniquely designed clothing hanger, determined that acceptable non-infringing alternatives were available and addressed the commonly-used Georgia Pacific factors to determine a reasonable royalty.

- In an alleged patent infringement of a component in a prenatal vitamin, assessed the commonly-used Panduit factors and determined lost profits was an inappropriate remedy. Calculated a reasonable royalty based on assessment of the Georgia Pacific factors.

- In an alleged theft of trade secrets involving transportation logistics software, examined customer selling patterns to determine what economic quantifiable effect (if any), the secret information had on the sales of both parties.

**Contract Dispute and Damage Analysis**

- For a breach of contract case, collected and analyzed data to determine urinary catheter demand and estimated appropriate market shares for each type of end user. Created and maintained this database, and performed statistical analyses to calculate but-for past and future sales.

- Estimated the value of a start-up company under the counterfactual assumption that the defendant adequately provided the key input. The value of the company was based on the actual market shares of selected comparable companies as well as market valuations of selected comparables at various points in time.

- For a breach of contract case involving sale of cosmetics in Kuwait, the economic effects of the Gulf War were separated from breaches of contract in determining but-for sales.

- Determined whether plaintiff got the benefit of a most favored nations clause (aka MFN) by econometrically adjusting the price schedule, including volume discounts, given to another customer.

- In a case involving customer tracking software, the effects of alleged misconduct were econometrically separated out from effects caused by general dot-com market problems.

- In a breach of contract case that required the estimation of the incremental costs associated with volume of services in multiple areas of computer support, applied linear and non-linear regression methods to estimate lost profits.

**Antitrust and Damage Analysis**

- Estimated economic damages under the counterfactual assumption that the defendant had not engaged in the anti-competitive conduct. Used selected comparable companies and applied the Lerner Index to estimate output and market-price effects of the exclusionary conduct. Identified the relevant product market, calculated market shares, estimated marginal cost, and assessed the likely exercise of market power. The results were subjected to multiple sensitivity analyses with regard to assumed or estimated parameters and found to be robust.

- Performed a market analysis of the paint can market to determine barriers to entry and existence of sub-markets (or significant product differentiation) with respect to plastic

Nicole A. Liska – Page 4

**EXHIBIT 8 – PAGE 079**

paint cans. Analyzed and critiqued marginal cost calculations made by opponents with respect to its breach of contract claim.

- Specified and estimated logistic regression models of consumer choice for cataract eye surgery centers and hospitals.

- Estimated potential exposure to the aggregation and use of market power by sellers of automotive glass.

- Estimated economic damages resulting from alleged price discrimination. Applied an oligopoly model to estimate output and market-price effects of the price discrimination. Identified the relevant product market, calculated market shares, measured marginal cost, and assessed the likely joint exercise of market power. The results were subjected to multiple sensitivity analyses with regard to assumed or estimated parameters and found to be robust.

**Securities Analysis and Accounting Malpractice**

- Determined economic losses suffered by lenders on security interests in a company whose financial statements had been falsified. Estimated the value of the company, which then determined the implied value of the security interest at issue in the case, under the counterfactual assumption that proper financial disclosures had been made at earlier dates. Company value estimates were determined at different dates based on factors including (but not limited to) actual market transactions, change in financial conditions, and analyses of importance of various financial results to the market place.

- Assessed the economic losses suffered by investors of thinly traded securities (i.e., life insurance policies) in which material misrepresentations regarding the use of investors' funds and diverting funds for improper purposes were alleged. Life insurance policy values and expected rates of return were analyzed and compared with expected rates of return of comparable investments and with actual market transactions.

- Estimated economic losses suffered by a bondholder whose bonds' value fell allegedly as a result of the inadequacies of the bonds' servicer. Estimated the value of the bonds under the counterfactual assumption that the bonds had been serviced properly. Bond-value estimates were based on factors including (but not limited to) actual market transactions, change in market and financial conditions during the relevant time period, comparable bond values, and analyses of the relative importance of various economic and financial results to the market place.

Nicole A. Liska – Page 5

**EXHIBIT 8 – PAGE 080**

| Client | Case Allegations | Testimony Description | Testimony Date | Name of Case | Name of Retaining Law Firm/Attorney | Case No | Court |
|---|---|---|---|---|---|---|---|
| Defendant | Wrongful employment termination | Economic damages | February 4, 2019 | Charles Matthew Erhat v. BofI Federal Bank et al. | Sheppard Mullin Richter & Hampton LLP | 15-cv-2287-BAS-NLS consolidated with 15-cv-2353-BAS-NLS | UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA |
| Defendant | False advertising | False advertising damages | July 12, 2017 | Trevor Singleton, individually and on behalf of all others similarly situated v. Fifth Generation, Inc., d.b.a. Tito's Handmade Vodka | Greenberg Traurig, LLP - Rick L. Shackelford | 5:15-CV-0474 (GTS/TWD) | UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF NEW YORK (Deposition) |
| Plaintiff | Personal Injury | Present Value Calculation of Lost Earnings | July 16, 2015 | Johnny Carter v. Custom Transportation, LLC, et al. | The Law Offices of Thomas Edwards, PC - Thomas Edwards | CV-2014-900048 | Circuit Court of Marengo County, Alabama (Deposition) |
| Plaintiff | Personal Injury | Economic damages lost earnings; present value of life care plan | June 27, 2014 | Katie Ann Fasoli v. Morgan Southern Inc., et al. | Law offices of Todd Rash - William Light | TC027331 | Superior Court of California, County of Los Angeles, South Central District (Deposition) |
| Plaintiff | Race discrimination including a failure-to-promote | Statistical analyses (Fisher Exact test, Chi-Square test) determining whether discrimination occurred; Economic damages | September 2011 deposition / December 2011 trial | Louisa Diaz v. the County of Los Angeles | Louis. P. Dell, Esq. | 2:10-cv-07329-SVW -RZ | UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA |
| Defendant | Wrongful employment termination | Economic damages | July 2011 | Penny Clemmons vs. Price, Postel & Parma, LLP et al. | LeClairRyan / Gary P. Simonian, Esq. | 1340223 | Superior Court of California, County of Santa Barbara (Deposition) |
| Plaintiff | Wrongful termination involving disability discrimination | Economic damages | 2004 | Marcella Lee vs. The Bel-Air Bay Club | Abrolat & Teren LLP / Pamela McKibbin Terren | | |

**EXHIBIT 8 - PAGE 081**