GREENBERG TRAURIG, LLP
Rick L. Shackelford (SBN 151262)
Adam Siegler (SBN 116233)
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone: 310-586-7700; Fax: 310-586-7800
Email:   *ShackelfordR@gtlaw.com*
         *SieglerA@gtlaw.com*

Attorneys for Defendants
Ocean Spray Cranberries, Inc. and Arnold Worldwide, LLC

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL HILSLEY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OCEAN SPRAY CRANBERRIES, INC.; ARNOLD WORLDWIDE LLC, and Doe Defendants 1 through 5, inclusive,<br><br>Defendant. | CASE NO.: 3:17-CV-2335-GPC-MDD<br><br>[Hon. Gonzalo P. Curiel]<br><br>**DEFENDANT OCEAN SPRAY CRANBERRIES, INC.'S REPLY BRIEF IN SUPPORT OF MOTION TO DECERTIFY CLASS**<br><br>[Filed concurrently with: Declaration of Rick Shackelford]<br><br>Date:      June 28, 2019<br>Time:      1:30 p.m.<br>Courtroom: 2D<br><br>Date of Removal:      September 19, 2017 |

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

This Court certified a "damages" class conditioned on Plaintiff's ability to develop real world evidence to substantiate her damages model. However, new evidence (some acquired since Defendants filed this Motion) proves Plaintiff's model does not account for supply side figures and does not support a price premium associated with the "no artificial flavors" claim. Plaintiff's damages model fails and cannot satisfy *Comcast*.

Ocean Spray's motion to decertify showed that a critical component of Plaintiff's calculation was an assumed average price of $3.25 per 64-ounce bottle, which new evidence shows is inflated. This assumed average price was the only tether to real world market conditions, ostensibly accounting for "supply side figures" as a price at which retailers had sold significant amounts of the Products. This tether was seminal to the Court's preliminary conclusion that "Because Plaintiff has demonstrated she is able to account for supply-side factors, the Court concludes that Plaintiff has demonstrated a damages framework to determine that the price premium paid for the 'no artificial flavors' is attributable to Defendants' alleged misrepresentations . . ." [Dkt. 83, at 30:8-12.] In mathematical terms: the reference $3.25 price is the minuend and the reported "willingness to pay" for the Products with "knowledge" of the "artificial flavors" from Belch's contingent valuation consumer survey supplies the subtrahend. The difference (if any) would purportedly represent the alleged "price premium" in her formula. But, when we plug real world data into Belch's framework, no such premium exists.

Recognizing the case was at an early stage, the Court noted that Plaintiff might obtain actual retail sales data to plug into her formula in place of Belch's assumed price. [*Id.*, at n.16.] The Court further noted that a plaintiff's damages report must reflect a "realistic" price range, with prices both higher and lower than current prevailing prices. [*Id., citing Broomfield v. Craft Brewing Alliance, Inc.,* Case No. 17-cv-1027-BLF, 2018 WL 4952519, at *18-19 (N.D. Cal. Sept. 25, 2018).]

Subsequent to the Court's ruling, and in response to Ocean Spray's motion to decertify, two important events have taken place. <u>First</u>, Belch's deposition confirmed

1

3:17-CV-2335

OCEAN SPRAY'S REPLY ISO MOTION TO DECERTIFY CLASS

that his $3.25 assumed average price *was not derived* from any scientific evidence or statistical sampling of retail prices at a variety of retail channels, but rather came from reviewing a small smattering of posted online prices for two products, in a limited time frame in 2018. [Declaration of Rick Shackelford ("Shackelford Decl."), Ex. A ███ ███████████████████████.] Second, Plaintiff obtained actual retail sales data from ███ which demonstrates that Belch's $3.25 reference price was substantially inflated. Indeed, the ███ data shows that in the covered four-year period (2015-2018), the actual average price actually paid in California for the 64-ounce bottles of Ocean Spray Cran Apple and Cran Grape products (which were the only ones Belch used in his survey – ignoring all other Products and configurations) sold for an average price of ███ [Shackelford Decl., Ex. B ██████████████], and all 64-ounce Ocean Spray products sold for an average price of ███. [██████████.] At best only ████████ of actual sales of the 64-ounce products occurred at price points of ███ or higher. [███.] The average price consumers actually paid was *less* than the price Belch opined they would be "willing to pay" for the Products, even if they were labeled as "artificially flavored," based upon his survey. The actual prices show *no* premium (even per Plaintiff's so-called damages framework). Belch's inflated reference price is not tethered to prices actually paid in the real world. Therefore, Belch could not address the supply side concerns of his contingent valuation method ***even if his survey did not suffer from a myriad of other flaws***.

Belch's deposition testimony, however, confirms just how flawed that survey is. For example, he did not have adequate controls. He did nothing to account for, let alone counteract, preexisting impressions. Time after time at deposition, when confronted with guidelines established in Professor Diamond's "Reference Guide on Survey Research" – a work Belch acknowledged as authoritative – he admitted he had not followed them. [████████████████████████████████████.] But worst, he did not pretest his questions, so he has no basis to assert that the respondents understood them. This failure infected his "willingness to pay" question. Belch testified that the

2

OCEAN SPRAY'S REPLY ISO MOTION TO DECERTIFY CLASS

"willingness to pay" numbers his respondents provided likely reflected the prices they had actually paid for the Products, and *not* any difference in perceived value attributable to the challenged label claim. Thus, his survey is useless to measure any change in consumers' willingness to pay for the Ocean Spray Products if they had known the Products allegedly were "artificially flavored."[1]

Taken together, these numerous flaws leave Plaintiff's damages formula in tatters.[2] Even if the arithmetic is correct, *subtracting one meaningless number from another meaningless number cannot produce a meaningful number*. The real world supply side data shows that the average price consumers *actually paid* for the Products was the same price Belch's survey purportedly revealed consumers would be *willing to pay* for a product that was labelled as "Artificially flavored" – ▮. The ▮ data establishes that consumers could readily find the Products at every "willing to pay" price interval below Belch's $3.25 reference price. There is no corresponding evidence that retailers would be willing to slash retail prices by an additional 19%, as Belch's "premium" opinions

---

[1] Also, see Defendant's Opposition to Motion for Class Certification, which outlines additional flaws, such as Belch's use of an inappropriate purported "test" bottle designed by Plaintiff's counsel that fails to comply with applicable regulations, the false description of Ocean Spray's Products as "artificially flavored," when the characterizing flavors come from fruit juice, failing to control for the 'shock value' of label, etc.

[2] Belch's survey is so riddled with deficiencies that it does not support any competent opinions or conclusions. Worse yet, Belch confirmed at his deposition that his opinions about consumers' "willingness to pay" ▮. [▮.] In his report, Belch stated that a majority of respondents confronted with his "disclosure" would not buy the Products, and Belch admitted in his deposition that he had no opinion what impact non-purchasers would have on market prices because he never studied it. [▮.] Further, overwhelming majorities – *nearly 90% of his respondents* – said they would pay real world average price of the Products *or more* under any circumstance (irrespective of any "no artificial flavors" or "artificial flavors" claim). [▮.] To manufacture his "premium" opinions, Belch ignored the responses of nearly three-fourths of his respondents and opined that the responses of this small minority more accurately reflected the behavior of the population of all purchasers of the Ocean Spray Products.

3

necessarily imply. With real data plugged in, if Plaintiff's damages framework "proves" anything, it proves there is *no difference* in how consumers value the Products (even if labeled as "Artificially Flavored") and the prices at which those Products sold at retail in California. Plaintiff's damages model does not satisfy *Comcast*.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Underlying Lawsuit—Substantive Allegations

Plaintiff's sole theory of damages is that the "no artificial flavors" claim creates a premium above the price consumers would be willing to pay if they knew the Products were "artificially flavored."[3] Thus, Belch designed a survey to test that proposition. For context, it is important to recall that *all* of the respondents who completed his survey had recently (within 6 months) purchased Ocean Spray "cranberry juice" products. People who had not were screened out. However, Belch does not know which products they bought or how many. He also had no information about what actual retail prices his survey respondents had paid. His survey communicated a made-up reference price for generic "cranberry juice" (not Ocean Spray products) of $3.25, then attempted to uncover what price respondents would be "willing to pay" if they found out that Ocean Spray's Cran Apple and Cran Grape Products were "artificially flavored."

Except his survey could not determine what information his respondents were providing, because (i) he did not know what price they had actually paid; and (ii) he could not tell whether their responses reflected their own purchasing history or were a reaction to his reference price. Indeed, Belch conceded as much in his deposition:



---

[3] As discussed in Ocean Spray's summary judgment motion, each of the Products derives its characterizing flavor from fruit juice. The Products are not "artificially flavored" and malic acid and fumaric acid do not function as artificial flavors in any of the Products.

4

3:17-CV-2335

OCEAN SPRAY'S REPLY ISO MOTION TO DECERTIFY CLASS

[████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████.]

This testimony devastates Belch's opinions about a premium. He concedes that respondents not only *could*, but almost certainly *did*, *factor* their real world experience into their survey responses, and he had no way of knowing who paid what, or who responded on that basis. [█] He has no idea if any "willingness to pay" prices represented what the consumer would have actually paid, a reduction from that price that they were willing to pay, a reduction from his reference price, or anything else.[4] Thus, he cannot draw any connection between their responses and his reference price, *much less have any basis for saying that the disclosure regarding "artificial ingredients" solely accounts for any difference* (the only relevant point).[5] Belch failed to control for real

---

[4] Because Belch's reference price referred to generic "cranberry juice," it is also possible that his respondents did not understand that he intended them to apply the reference price prompt to the two Ocean Spray products his survey inquired about. Belch acknowledged in deposition that [████████████████████████████████████████████████████████]. [████████████████████████████████████.] So he has no information to assess what his respondents understood (although their responses so closely match the real world price conditions that the implications are obvious).

[5] In survey science, information about real world experience is known as "preexisting impressions," which confound a survey testing a causal proposition, because one cannot

world experience. Without knowing what the responses mean, they are meaningless. Belch's flawed damages model must be discarded and cannot support class certification.

III. ARGUMENT

A. The Newly-Produced ▮ Data Prove No Premium Exists

Plaintiff chides Ocean Spray for producing "no evidence" that Belch's $3.25 reference price was unjustified, but the point is academic now, because Plaintiff – albeit long after the November 8, 2018 fact discovery cutoff in this Court's Scheduling Order [Dkt. 14] – has produced information on actual retail sales that proves Belch's reference price is unsupportable. Even Plaintiff concedes that decertification is appropriate based upon the discovery of new facts. [Opp. Mem. at 7:23-28 (*quoting Ramirez v. Trans Union, LLC*, No 12-cv-00632-JSC, 2016 WL 6070490, at *2 (N.D. Cal. Oct. 17, 2016).]

The newly-produced ▮ data is a game changer.[6] Plaintiff's expert Goedde concedes that the ▮ data proves that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.] This concession is compelled by arithmetic (total sales dollars divided by 64-ounce units sold), so the only thing surprising about it is Goedde's lack of candor in discussing it. As set forth in the accompanying Supplemental Report of Nicole Liska, Ocean Spray's rebuttal expert, ▮▮▮▮▮▮▮ is a dramatic understatement.

First, ▮ data show that the average selling price of all Ocean Spray 64-ounce bottles is ▮ (and the average for Cran Apple and Cran Grape was ▮ ). [▮▮▮▮] This includes all channels of trade because the ▮ data does not

---

disentangle the preexisting impressions from impact created by the proposition being tested. One way to address this phenomenon is to have adequate controls, but, as Belch testified, he had no controls in his survey experiment to do so. *See* Shackelford Decl., Ex. C. (Reference Guide on Survey Evidence).]

[6] Plaintiff's pleas of diligence in pursuing ▮ data are unavailing. The motion to decertify was the true catalyst for her pursuing that information. That motion was filed on April 11, 2019. Her subpoena to ▮ is dated ***May 7, 2019 – nearly a month later***. [*See* Dkt. 145-3 (Houchin Declaration, Exhibit 1).]

6

3:17-CV-2335

OCEAN SPRAY'S REPLY ISO MOTION TO DECERTIFY CLASS

disaggregate "grocery stores" from other retailers. When compared to Belch's "willingness to pay" results, the real world data show no premium; the numbers match Belch's survey results to the penny. [█] In other words, consumers actually paid what they were willing to pay for the Products, even if labelled as "Artificially Flavored".[7]

Second, the █ data – which represents the actual amount of money exchanged in actual retail transactions, as opposed to posted prices at a few places on a few days – shows that a mere █ of 64-ounce bottles of Ocean Spray products retailed on average for █ or more. [████████.] Belch's $3.25 reference price is representative of less than █ of sales, and thus is overstated for more than █ of actual sales in the █ data. █ To elaborate further, Goedde is correct that the █ data shows that prices for the 64-ounce bottles "ranged" as high as $3.99. But this tells an incomplete and highly distorted picture. The █ data shows that of the approximately ██████ 64-ounce bottles sold at retail, *only* █ *bottles* sold at an average price of more than ███. Using Belch's $3.25 number as a reference point, ████████████████████████████████████████████. So much for the claim that the $3.25 price point speaks to real world conditions. The actual data conclusively proves otherwise.

Once the █ data is rigorously analyzed, Plaintiff's $3.25 average reference price is thoroughly refuted, and her price premium model implodes. A few basic reminders are in order. First, Belch's survey only looked at the labels and prices of 64-ounce bottles of Ocean Spray Cran Apple and Cran Grape. He has no information on willingness to pay for any of the other Products at issue or any other package configurations, and no basis to extrapolate his opinions to products with different labels that do not feature the challenged "no artificial flavors" claim on the front of the bottles as the 64-ounce bottles do. Second, there is no basis to extrapolate "willingness to pay" responses regarding

---

[7] Ocean Spray's survey expert has demonstrated that consumers do not regard the claim "no artificial flavors" as significant to their purchase decision, much less having any impact on the price they are willing to pay. ████████████████████████████████

those 15% juice products to other products – especially 100% juice products, which Belch conceded are different from 15% juice products, and that consumer bases for those respective product lines could "possibly" be different. [█████████████.]

Third, Goedde's efforts to rope in other products and package configurations attempting to justify $3.25 as an average price for 64-ounce bottles should be disregarded for obvious reasons: they are other products and package configurations, and thus do not speak at all to the products Belch used in his survey.

Fourth, Belch's own survey rejected the opinions of ███ of its respondents, yet he applies the opinions of the small minority to the whole class. Notwithstanding the other flaws of his survey, the alleged 19% premium ignores the nearly three quarters of the populations' indifference to the claim.

The parties agree that new facts can justify decertification. Here, those facts have completely undermined Plaintiff's damages model. This is simple arithmetic, performed on data equally-available to both sides, which establishes that Belch's assumed average retail price for 64-ounce bottles of Cran Apple and Cran Grape is insupportable. The parties only differ about what should happen. Plaintiff believes nothing has changed, except now her claimed damages are up to more than ████████, still using the completely debunked $3.25 reference price. Ocean Spray believes that the ███ data shows the actual prices paid are the same as Belch's willingness to pay, and thus show no premium at all. At this juncture, the Court is not being called upon to resolve which side is correct. Rather, the question is whether, after a rigorous analysis, the Plaintiff's damages model – keyed, as it was, off a $3.25 (insupportable) reference price – stands up in light of actual data. The answer is clear: the model does not hold up. There is no evidence to cure the supply-side problem that has plagued Plaintiff's model from the outset. The problem with her minuend also infects her subtrahend, as the "willingness to pay" numbers from Belch's survey match the actual real world average prices, not Belch's inflated reference price. Thus, both factors in her damages formula are meaningless. And, for the clencher, Hilsley has no evidence that real world retailers

8

would reduce their prices 19% *no matter what Ocean Spray's labels said*. [█████████████████████████.] This new evidence compels decertification.

### B. Plaintiff's Damages Guesstimates Are Unavailing

Ironically, now that Plaintiff has data to make exacting (alleged) damage calculations, she intentionally ignores the data and argues that precision is not required – not surprising since the data fatally undermines her position. Plaintiff relies on *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170 (9th Cir. 2017), *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2008), and *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2014) all for a basic and general proposition that difficulty calculating an *amount* of damage or restitution will not defeat certification or justify decertification, *provided* that the *theory of damage* satisfies *Comcast* and tracks the theory of liability. Her argument completely misses the point of Ocean Spray's motion. The question here is whether Plaintiff's purported damages methodology tracks the theory of her complaint: namely, that the impact of the label element, and not something else – such as survey respondents' own personal purchase history – demonstrates some difference in value or perceived value, as expressed in willingness to pay. Now that we know where Belch obtained his reference price and how he measured purported willingness to pay, we can compare his results to real world data and see that his methodology fails. Platitudes about the sufficiency of estimating damages cannot sweep Belch's critical errors under the rug in favor of retaining a certified class.

### C. Plaintiff's Defense of Goedde's Analysis Misses the Point

In her final argument, Plaintiff argues that Goedde can perform a damages calculation in a way that passes *Daubert*. This argument misses the point of Ocean Spray's motion and is irrelevant. In this case, Goedde is, and always has been, merely a cipher. The math is not the issue. The problem is Belch's input, not Goedde's output.

We now know that more than ██ of retail sales occurred below the $3.25 reference price. [███████████.] If Belch's survey can tell us anything, it tells us the "willingness to pay" of his survey respondents effectively mirrors actual market

9

conditions. It should surprise no one that his respondents' reported "willingness to pay" numbers align with the ██ "actually paid" numbers, because Belch had no controls to counter the phenomenon of preexisting impressions. Goedde's output cannot atone for the "garbage in" of Belch's $3.25 reference price, nor the "garbage in" of his meaningless willingness to pay numbers. The Court need not perform a *Daubert* analysis to know that garbage in equals garbage out. *See In re Pom Wonderful, LLC*, Case No. ML-10-02-02199-DDP, 2014 U.S. Dist. Lexis 40415, at *21 (C.D. Cal. Mar 25, 2014) (a model that simply calculates a price difference without being tied to a theory of liability does not satisfy *Comcast*).

Plaintiff's damages methodology does not satisfy *Comcast*, because Belch cannot tell whether his respondents' "willingness to pay" less than his reference price was in reaction to his disclosure about purported "artificial flavors" or merely reflected their own experience in buying the Products. The design flaws in his survey make it impossible for him to tie his opinions solely to a lower perceived value of the Products that are "artificially flavored," which is the Plaintiff's theory of harm. In any event, applying the evidence to Plaintiff's theory shows **no premium exists**. This case amply demonstrates why class certification orders are interlocutory. Sometimes classes must be decertified because the numbers just don't add up. This case proves the point.

## IV. CONCLUSION

Plaintiff's damages model cannot satisfy *Comcast*; the class should be decertified.

Dated: June 14, 2019

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: /s/: Rick L. Shackelford
Rick L. Shackelford
Adam Siegler
Attorneys for Defendants
Ocean Spray Cranberries, Inc. and
Arnold Worldwide, LLC

10